Isaac LORA et al., Plaintiffs,

v.

The BOARD OF EDUCATION OF the CITY OF NEW YORK et al., Defendants.

No. 75 Civ. 917.

United States District Court, E. D. New York.

May 12, 1977.

---

Charles Schinitsky, The Legal Aid Society, Juvenile Rights Div., Brooklyn, N.Y., Nathaniel R. Jones, James I. Meyerson, National Association for Advancement of Colored People, New York City, for plaintiffs; Michael J. Dale, Gene B. Mechanic, Henry S. Weintraub, Jane M. Sufian, Brooklyn, N.Y., of counsel.

W. Bernard Richland, Corp. Counsel of the City of New York, New York City, for City defendants; Joseph F. Bruno, and Carol Noymer, New York City, of counsel.

WEINSTEIN, District Judge.

This pre-trial discovery motion, in a suit brought to protect maladjusted and disturbed New York City school children, raises important issues of the rights of non-party students to privacy and to the protections of the psychiatrist-patient privilege. These rights are not absolute. They must be balanced against other important rights and needs. In the special circumstances here presented, and given adequate limitations on use to prevent embarrassing disclosures, the limited right or privilege to protect therapist-patient interchanges must yield. The value of a just determination of the facts in this litigation outweighs any speculative costs of disclosure. Neither the Constitution nor the Federal Rules of Civil Procedure or of Evidence provide a bar to limited discovery of the diagnostic and evaluation files of specific non-identifiable children in the New York City educational system. Plaintiffs are entitled to have their experts see selected psychiatric, psychological, social work and related records to prepare to testify.

## I. FACTUAL AND PROCEDURAL BACKGROUND

The Board of Education of the City of New York, pursuant to state statutory authority, N.Y. Educational Law § 3214 (McKinney 1970), presently maintains fifteen "Special Day Schools for Socially Maladjusted and Emotionally Disturbed Children" (SMED schools). Their purpose is "the social, emotional and educational rehabilitation of children whose needs are such that they cannot be met in the normal setting of a large school, who have demonstrated over a period of time a lack of reasonable self-control, and whose behavior is seriously disrupting the education of large numbers of children in the regular school." Special Circular No. 47, 1972–73, N.Y. City Bd. of Ed.

### A. *Plaintiffs' Application For Pretrial Disclosure*

Plaintiffs in this civil rights action are all Black and Hispanic children assigned to such schools. They maintain, among other complaints, that the standards for identification, evaluation and educational placement of emotionally handicapped children are vague, ambiguous and over-broad, and are applied in a capricious, arbitrary and racially discriminatory manner that is violative of their federal constitutional and statutory rights to due process of law and equal educational opportunity. U.S.Const. Amend. 14; 42 U.S.C. §§ 1981, 1983, 2000d.

To provide evidentiary support for these charges plaintiffs, by the discovery motion now before the court, F.R.C.P. 34, 37, seek production of fifty randomly selected diagnostic and referral files employed by either the City's Bureau of Child Guidance or Office of Evaluation and Placement in determining whether a given student required placement in a SMED school. These files include the student's school history, teachers' observations, social workers' studies of the student and his family, results of psychological and psychiatric consultations or examinations, and other clinical and intensely personal information. Plaintiffs' experts will examine that data for evidence of racial discrimination in the referral process. They do not need to know the names of the persons whose files they will examine since it is primarily methodology that concerns them. All parties agree, therefore, that if the files are supplied, names and identifying data will first be redacted.

### B. *Methods By Which Students' Files Are Compiled And Kept*

The material contained in these files is the product of procedures for identifying emotionally disabled students, initiated when a teacher or administrator at a regular school alleges that a particular pupil manifests maladaptive, disruptive or aggressive behavior. When such a complaint is made the child is referred to the school guidance counselor who, following consultation with the student's parents, determines whether detailed clinical assessment is required. If it is not, the child is returned to the regular classroom environment. If, on the other hand, further study is thought advisable, the counselor assembles all data pertinent to the case, including an educational profile and information concerning the pupil's previous contacts with courts, clinics, hospitals and social agencies, and refers it to a Bureau of Child Guidance or Office of Evaluation and Placement worker, who is either a registered psychologist or registered social worker assigned to the school. The clinician then screens the referral on the basis of the assembled data. If he determines that placement in a special day school is indicated, he is required to confirm that finding by a three-part evaluative study including a psychological examination, a casework study of the family by a social worker, and a psychiatric consultation or examination.

Placement in a SMED school may not be affected unless the psychiatrist, psychologist and social worker substantially concur on the desirability of that course. Parental consent for this and every previous step in the referral process is required.

All material collected during evaluation and diagnosis is maintained in files by the Bureau of Child Guidance or Office of Eval-

uation and Placement. While these records appear to be generally safeguarded against third-party inquiries, they are not afforded absolute confidentiality. Testimony and evidence before the court indicate that clinical files are released at the Chancellor's direction to law enforcement authorities, and on request to the Legal Department of the Board of Education, the Corporation Counsel and the Comptroller's Office. In addition, reports prepared by clinicians and containing sensitive information are provided to the principal and other members of the professional staff of the SMED schools. Finally, these files are routinely provided in response to court ordered subpoenas—a fact of which parents are advised at the outset of the referral process and prior to their consenting.

## II. LAW

Defendants assert that compelling production of these documents will constitute an unconstitutional invasion of the subject students' right to privacy. U.S.Const. Amend. 14. We assume for the sake of this discussion the standing—and even obligation—of school officials to assert such rights on behalf of their students absent a disclaimer by the student or an indication that the issue is not being raised in good faith for the student's welfare. *Planned Parenthood of Cent. Mo. v. Danforth,* 428 U.S. 52, 96 S.Ct. 2831, 2837–38, 2846–47, 49 L.Ed.2d 788 (1976). *But cf. Alderman v. United States,* 394 U.S. 165, 89 S.Ct. 961, 22 L.Ed.2d 176 (1969).

It is also claimed that the material is protected by a federal evidentiary privilege and is, therefore, immune from discovery under the Federal Rules of Civil Procedure. Rule 26(b)(1) prevents discovery of privileged material. It provides in pertinent part:

> Parties may obtain discovery regarding any matter, *not privileged,* which is relevant to the subject matter involved in the pending action . . . . .

(Emphasis supplied.)

Detailed consideration of the evidentiary privilege claim is limited to the status of communications made directly by students or their parents to psychiatrists or registered psychologists or social workers. Those communications are the most sensitive with which we are here concerned, and subject to the greatest traditional protection. They are, in fact, the subject of explicit statutory privileges under New York State law. *See* N.Y.C.P.L.R. 4504, 4507, 4508. The New York law of privileges is not decisive because the claim arises under federal law. *See* Federal Rules of Evidence, Rule 501. Nevertheless, as demonstrated below, New York's view of the matter and the expectations of its professionals and its patients may not be ignored. *See, e. g., United States v. King,* 73 F.R.D. 103, 105 (E.D.N.Y.1976); *Apicella v. McNeil Laboratories, Inc.,* 66 F.R.D. 78 (E.D.N.Y.1975).

Substantial guidance is provided by the most recent and comprehensive statement by the Supreme Court, embodied in Proposed Rule 504 of the Federal Rules of Evidence, on the proper scope of the psychotherapist-patient privilege. While promulgated by the Supreme Court that rule was not accepted by Congress. Nevertheless, as noted below in section II–B–7 of this opinion, it is an appropriate guide and standard under Rules 102 and 501 of the Federal Rules of Evidence.

### A. *Constitutional Privacy Claims*

The Supreme Court has suggested that some relationships and individual interests not specifically enumerated in the Constitution are entitled to a limited immunity from regulation and interference. In *Roe v. Wade,* 410 U.S. 113, 93 S.Ct. 705, 35 L.Ed.2d 147 (1973), Mr. Justice Blackmun tentatively delineated the nature of those "fundamental" relationships and interests, and their sources of protection.

> The Constitution does not explicitly mention any right of privacy. In a line of decisions, however, . . . the Court has recognized that a right of personal privacy, or a guarantee of certain areas or zones of privacy, does exist under the Constitution. In varying contexts, the Court or individual Justices

have, indeed, found at least the roots of that right in the First Amendment, *Stanley v. Georgia* [394 U.S. 557, 89 S.Ct. 1243, 22 L.Ed.2d 542,] . . . ; in the Fourth and Fifth Amendments, *Terry v. Ohio* [392 U.S. 1, 88 S.Ct. 1868, 20 L.Ed.2d 889,] . . . , *Katz v. United States* [389 U.S. 347, 88 S.Ct. 507, 19 L.Ed.2d 576,] . . . ; in the penumbras of the Bill of Rights, *Griswold v. Connecticut* [381 U.S. 479, 85 S.Ct. 1678, 14 L.Ed.2d 510,] . . . ; in the Ninth Amendment, *id.* . . . ; or in the concept of liberty guaranteed by the first section of the Fourteenth Amendment, see *Meyer v. Nebraska* [262 U.S. 390, 43 S.Ct. 625, 67 L.Ed. 1042,] . . . . These decisions make it clear that only personal rights that can be deemed "fundamental" or "implicit in the concept of ordered liberty," *Palko v. Connecticut* [302 U.S. 319, 58 S.Ct. 149, 82 L.Ed. 288,] . . . , are included in this guarantee of personal privacy. They also make it clear that the right has some extension to activities relating to marriage, *Loving v. Virginia* [388 U.S. 1, 87 S.Ct. 1817, 18 L.Ed.2d 1010,] . . . [miscegenation]; procreation, *Skinner v. Oklahoma* [316 U.S. 535, 62 S.Ct. 1110, 86 L.Ed. 1655]. . . [sterilization]; contraception, *Eisenstadt v. Baird* [405 U.S. 438, 92 S.Ct. 1029, 31 L.Ed.2d 349] . . . ; family relationships, *Prince v. Massachusetts* [321 U.S. 158, 64 S.Ct. 438, 88 L.Ed. 645] . . . ; and child rearing and education, *Pierce v. Society of Sisters* [268 U.S. 510, 45 S.Ct. 571, 69 L.Ed. 1070] . . . , *Meyer v. Nebraska* [362 U.S. 390, 43 S.Ct. 625, 67 L.Ed. 1042] . . . .

410 U.S. at 152–53, 93 S.Ct. at 726–27, 35 L.Ed.2d 147 (footnotes omitted). *Cf.* generally, Perry, Substantive Due Process Revisited, 71 Nw.U.L.Rev. 417 (1977).

The precise contours and dimensions of this "zone of privacy" are vague, the rights encompassed by the rubric difficult to define at this stage of the doctrine's development. Yet the implicated interests are no less important because they cannot be measured with precision. As one scholar has pointed out, "we will know which rights are and which are not within the zone only case by case, with lines drawn and redrawn, in response to individual and societal initiatives and the imaginativeness of lawyers." Henkin, Privacy and Autonomy, 74 Colum. L.Rev. 1410, 1426 (1974).

Two distinct but related personal privacy interests of students are here arguably impaired. First, is the right to have intimate biographical details protected from exposure by the government—"the demand which the individual may make that his private personal affairs shall not be laid bare to the world. . . ." Pound, Interests of Personality, 28 Harv.L.Rev. 343, 362 (1915). Second, is the interest in independence in making those choices that may seriously effect personal physical or mental health—specifically, the right to be free to seek benefit from psychotherapeutic counseling. *Cf. Roe v. Wade,* 410 U.S. 113, 93 S.Ct. 705, 35 L.Ed.2d 147 (1973); *Doe v. Bolton,* 410 U.S. 179, 93 S.Ct. 739, 35 L.Ed.2d 201 (1973); *Whalen v. Roe,* 429 U.S. 589, 97 S.Ct. 869, 51 L.Ed.2d 64 (1977).

A forceful argument has been made that constitutionally protected privacy must, at a minimum, include the freedom of the individual to choose the circumstances, if any, under which some of his attitudes, beliefs and opinions are to be divulged. Ruebhausen and Brim, for example, usefully delineate this aspect of personal freedom as follows:

> [A]nother . . . facet of the claim to privacy . . . is the right to share and to communicate.

> Each . . . of us is well aware of this complicated, ambivalent personal need to communicate and the correlative need, even while communicating, to hold back some area, at least for the moment, for ourselves. Our personal experience is supported by the behavioral scientists. They have documented our need both to share and to withhold.

\* \* \* \* \* \*

Psychologically, then, privacy is a two-way street consisting not only of what we

need to exclude from or admit into our own thoughts or behavior but also of what we need to communicate to, or keep from, others. Both of these conflicting needs, in mutually supportive interaction, are essential to the well-being of individuals and institutions, and any definition of privacy, or of private personality, must reflect this plastic duality: sharing and concealment.

It follows that the right of privacy does not deal with some fixed area of personal life that has been immutably ordained by either law, or divinity, or science, or culture, to be off-limits and private. The essence of privacy is no more, and certainly no less, than the freedom of the individual to pick and choose for himself the time and circumstances under which, and most importantly, the extent to which, his attitudes, beliefs, behavior and opinions are to be shared with or withheld from others. The right to privacy is, therefore, a positive claim to a status of personal dignity—a claim for freedom, if you will, but freedom of a very special kind.

Ruebhausen and Brim, Privacy and Behavioral Research, 65 Colum.L.Rev. 1184, 1188–89 (1965) (footnote omitted); see also Fried, Privacy, 77 Yale L.J. 475 (1967); Parker, A Definition of Privacy, 27 Rutgers L.Rev. 275 (1974).

Such a claim is particularly compelling when the material to be disclosed includes communications by a patient to a psychotherapist. Essential to psychotherapy are confidential personal revelations about matters which the patient is normally reluctant to discuss. Frequently, a patient in analysis will make statements to his psychiatrist which he would not make even to the closest members of his family. Slovenko, Psychiatry and a Second Look at the Medical Privilege, 6 Wayne L.Rev. 175, 184–85 (1960). Revelations often concern the most intimate and embarrassing details of a patient's life, and their public exposure may well strip him of much of his own sense of human dignity.

In addition to the value of affording protection to patients' subjective interest in freedom from humiliation, there is a further, distinct, but causally related goal of encouraging the psychologically handicapped to seek and fully cooperate in psychotherapeutic counseling.

Psychotherapists and courts share a general consensus that, because of the uniquely personal nature of mental and emotional therapy, accurate diagnosis and effective treatment require an environment of confidentiality. In a frequently quoted passage, the Court of Appeals for the District of Columbia noted:

> The psychiatric patient confides more utterly than anyone else in the world. He exposes to the therapist not only what his words directly express; he lays bare his entire self, his dreams, his fantasies, his sins, and his shame. Most patients who undergo psychotherapy know that this is what will be expected of them, and that they cannot get help except on that condition. * * * It would be too much to expect them to do so if they knew that all they say—and all that the psychiatrist learns from what they say—may be revealed to the whole world from a witness stand.

Taylor v. United States, 95 U.S.App.D.C. 373, 222 F.2d 398, 401 (1955), quoting from Guttmacher and Weihofen, Psychiatry and the Law 272 (1952).

The legislative comment accompanying California Code of Evidence § 1014 (West 1968) is also typical:

> Psychoanalysis and psychotherapy are dependent upon the fullest revelation of the most intimate and embarrassing details of the patient's life. . . . Unless a patient . . . is assured that such information can and will be held in utmost confidence, he will be reluctant to make the full disclosure upon which diagnosis and treatment . . . depend.

In consideration of this deep-rooted and justifiable expectation' of confidentiality harbored by most individuals seeking psychiatric therapy, the California Supreme Court has suggested, in dictum, that the United States Constitution mandates protection of confidentiality:

[A] patient's interest in keeping such confidential revelations from public purview, in retaining this substantial privacy, has deeper roots than the California [statutory rules of evidence] and draws sustenance from our constitutional heritage. In *Griswold v. Connecticut, supra,* 381 U.S. 479, 484, 85 S.Ct. 1678, 1681, 14 L.Ed.2d 510, the United States Supreme Court declared that "Various guarantees [of the Bill of Rights] create zones of privacy," and we believe that the confidentiality of the psychotherapeutic session falls within one such zone.

*In re Lifschutz,* 2 Cal.3d 415, 431, 85 Cal. Rptr. 829, 839, 467 P.2d 557, 567 (1970).

While the California court's argument has force, some well reasoned federal cases take a directly contrary view. *Felber v. Foote,* 321 F.Supp. 85 (D.Conn.1970), involved a psychiatrist's action for himself and all practitioners of the healing arts in Connecticut for relief against enforcement of a statute compelling them to report the names of, and other information about, drug-dependent persons to the Commissioner of Health. In denying relief the three-judge district court held that "[t]here is no constitutional foundation for the cloak of confidentiality which gives a patient the privilege to exclude communications by him to his physician in judicial proceedings." 321 F.Supp. at 87. The court went on to state:

> Plaintiff further makes the unwarranted assumption that the special nature of the doctor-patient relationship affords him a constitutionally protected right to privacy in his conduct of the relationship. There is no "general constitutional right to privacy." . . .
>
> The plaintiff's conception of "privacy" which he seeks to protect bears no analogy to those spheres of privacy which have previously won constitutional protection.

321 F.Supp. at 88 (citations omitted). *Cf. United States v. Mullings,* 364 F.2d 173, 176 n.3 (2d Cir. 1966); *Rumler v. Board of Sch. Tr. For Lexington Co. Dist. No. 1,* 327 F.Supp. 729, 742–43 (D.S.C.), *aff'd per curiam,* 437 F.2d 953 (4th Cir. 1971); *Caesar v. Mountanos,* 542 F.2d 1064 (9th Cir. 1976).

In one recent federal decision a three-judge district court did, contrary to most federal cases, hold that a constitutionally protected right of privacy embraces the physician-patient relationship generally. Relying on *Roe v. Wade,* 410 U.S. 113, 93 S.Ct. 705, 35 L.Ed.2d 147 (1973), and *Doe v. Bolton,* 410 U.S. 179, 93 S.Ct. 739, 35 L.Ed.2d 201 (1973), the court found:

> [T]he doctor-patient relationship is one of the zones of privacy accorded constitutional protection. . . . . While the doctor-patient relationship involved in *Roe* and *Doe* concerned the most intimate personal relationships, sexual relations and "whether to bear or beget a child," *Eisenstadt v. Baird, supra,* 405 U.S. at 453, 92 S.Ct. at 1038, and the right of privacy has primarily focused on home and family, it would be too restricted a reading of precedent for us to hold that the physician-patient relationship here is not constitutionally protected merely because it does not concern medical advice or professional judgments concerning child bearing. *See Roe v. Ingraham,* 480 F.2d 102, 107 (2d Cir. 1973).
>
> An individual's physical ills and disabilities, the medication he takes, the frequency of his medical consultation are among the most sensitive of personal and psychological sensibilities. One does not normally expect to be required to have to reveal to a government source, at least in our society, these facets of one's life.

*Roe v. Ingraham,* 403 F.Supp. 931, 936–37 (S.D.N.Y.1975). This decision was reversed under the name *Whalen v. Roe,* 429 U.S. 589, 97 S.Ct. 869, 51 L.Ed.2d 64 (1977).

That the balance drawn in the instant case is well within constitutional bounds is strongly suggested by the Supreme Court opinion in *Whalen.* There suit was brought challenging the constitutionality of New York Public Health Law provisions requiring all prescriptions for "Schedule II" substances—the class of most dangerous legitimate drugs—to be prepared on official forms provided by the state. One copy, identifying not only the drug and dosage,

but the patient's name, address and age, is filed with the State Bureau of Controlled Substances, to be retained for a period of five years, with pertinent data recorded on tapes for computer processing. Access to this information is accorded to certain health department and investigatory personnel. Plaintiffs contended that the patient identification requirement threatened to impair both their interest in non-disclosure of private information and also in making important medical decisions independently.

Evidence was adduced at the trial that the existence of the information about patients' use of Schedule II drugs creates a genuine concern that the data will become publicly known and adversely affect the patients' reputations. This concern makes them reluctant to use, and some doctors reluctant to prescribe, such drugs even when their use is medically indicated, and decisions vital to health care are thus adversely affected. The district court, as already noted, accordingly enjoined enforcement of the provisions of the Act requiring the reporting of patients' names and addresses.

While recognizing the privacy interests relied upon by the plaintiffs, the Supreme Court reversed on the ground

> that neither the immediate nor the threatened impact of the patient identification requirements . . . on either the reputation or the independence of patients for whom Schedule II drugs are medically indicated is sufficient to constitute an invasion of any right or liberty protected by the Fourteenth Amendment.

429 U.S. at 603–604, 97 S.Ct. at 878–79 (footnote omitted).

The court relied heavily on the fact that, as in the case before us, access to the information was rigidly safeguarded.

> [T]he State's carefully designed program includes numerous safeguards intended to forestall the danger of indiscriminate disclosure. Given this serious and, so far as the record shows, successful effort to prevent abuse and limit access to the personal information at issue, I cannot say that

the statute's provisions for computer storage, on their face, amount to a deprivation of constitutionally protected privacy interests.

429 U.S. at 607, 97 S.Ct. at 880 (Brennan, J., concurring).

Of particular relevance is the Court's acknowledgement that while the stored data might be offered in evidence in a legal proceeding, judicial supervision of its use would constitute adequate protection from a constitutional perspective. In this regard it noted:

> [T]he remote possibility that judicial supervision of the evidentiary use of particular items of stored information will provide inadequate protection against unwarranted disclosures is surely not a sufficient reason for invalidating the entire patient identification program.

429 U.S. at 601–602, 97 S.Ct. at 877–78 (footnote omitted).

And while the information must, as here, be divulged to some few authorized individuals, such a breach of total confidentiality was not constitutionally impermissible:

> Such disclosures . . . [are not] meaningfully distinguishable from a host of other unpleasant invasions of privacy that are associated with many facets of health care. Unquestionably, some individuals concern for their own privacy may lead them to avoid or to postpone needed medical attention. Nevertheless, disclosures of private medical information to doctors, to hospital personnel, to insurance companies, and to public health agencies are often an essential part of modern medical practice even when the disclosure may reflect unfavorably on the character of the patient. Requiring such disclosures to representatives of the State having responsibility for the health of the community, does not automatically amount to an impermissible invasion of privacy.

429 U.S. at 602, 97 S.Ct. at 878 (footnote omitted).

If such safeguards and other considerations render the attendant invasion of pri-

vacy permissible where identifiable data is involved, and where there was positive evidence of deterrence, then in this case where anonymity is assured and no proof of adverse impact has been adduced, limited disclosure is even more clearly permissible. *Cf. Utz v. Cullinane,* 172 U.S.App.D.C. 67, 520 F.2d 467, 481 n.38 (1975); *Schulman v. N.Y. City Health and Hosp. Corp.,* 38 N.Y.2d 234, 241, 379 N.Y.S.2d 702, 706, 342 N.E.2d 501, 504–05 (1975); *Planned Parenthood of Cent. Mo. v. Danforth,* 428 U.S. 52, 96 S.Ct. 2831, 2846–47, 49 L.Ed.2d 788 (1976).

Yet, in *Whalen v. Roe,* the Supreme Court seems to have implicitly acknowledged at least the potential constitutional dimension of the related privacy rights involved in that case. The Court wrote:

> The cases sometimes characterized as protecting "privacy" have in fact involved at least two different kinds of interests. One is the individual interest in avoiding disclosure of personal matters, and another is the interest in independence in making certain kinds of important decisions.

429 U.S. 589, 598, 97 S.Ct. 869, 876, 51 L.Ed.2d 64 (1977) (footnotes omitted).

In a footnote to this passage the Court quoted Professor Kurland as suggesting three related facets of the constitutional privacy right.

> "The concept of a constitutional right of privacy still remains largely undefined. There are at least three facets that have been partially revealed, but their form and shape remain to be fully ascertained. The first is the right of the individual to be free in his private affairs from governmental surveillance and intrusion. The second is *the right of an individual not to have his private affairs made public by the government.* The third is the right of an individual to be free in action, thought, experience, and belief from governmental compulsion." Kurland, The private I, The University of Chicago Magazine 7, 8 (Autumn, 1976).

429 U.S. at 599, 97 S.Ct. at 876 n.24 (emphasis supplied). The second of those interests dealing with unwanted publicity is primarily implicated in the case before us. This aspect of the constitutional right to privacy is not so adversely affected in this case as to warrant the court's providing a shield against limited and closely controlled discovery of the students' anonymous files. The files are open to so many people in their normal screening, counseling and educational use contemplated by the students and their families that no substantial unforeseen publicity will result from their being examined by a few more experts during the course of this litigation. Nevertheless, constitutional privacy rights involved do color the related claims based upon an evidentiary privilege. They require the privilege claim to be seriously and sympathetically considered.

### B. *Evidentiary Privilege*

### 1. *Policy Generally*

Whether or not related privacy rights are constitutionally protected, it is desirable as a matter of social policy to protect psychotherapist-patient confidences by an evidentiary privilege, at least to the extent that this may be done consistently with other social requirements.

In this respect the specialized psychotherapist-patient relationship is significantly distinguishable from the relation between physicians and patients generally. Privileges for information confided to a doctor were unknown to the common law, and while two thirds of the states have now followed New York's departure in legislating such protection, N.Y.Rev.Stat.1828, 406 (pt. 3, ch. 7, Tit. 3, Art. 9, § 73), these provisions have been the object of virtually unanimous scholarly criticism. McCormick, for example, observed:

> More than a century of experience with the statutes has demonstrated that the privilege in the main operates not as the shield of privacy but as the protector of fraud. Consequently the abandonment of the privilege seems the best solution.

McCormick, Evidence § 105 at 228 (Cleary, 2d ed. 1972) (footnote omitted); *see also* 8 Wigmore, Evidence § 2380a at 831–32 (McNaughton rev. 1961); Morgan, Suggest-

ed Remedy for Obstructions to Expert Testimony by Rules of Evidence, 10 U.Chi.L. Rev. 285, 290–92 (1943); Slovenko, Psychotherapy, Confidentiality, and Privileged Communication 20–24 (1966).

Many of these same commentators recognize that unlike the patient with physical complaints who will consult a physician regardless of whether confidentiality is guaranteed, a person with emotional and mental problems may seek help only if he is assured that his confidences will not be divulged, even in a courtroom. Accordingly, they favor a privilege for such communications to psychotherapists. McCormick's statement is typical.

> On account of the special therapeutic need for assurance to the patient of protection against disclosures it is cogently argued . . . that even in states not having the physician-patient privilege generally, a privilege should be recognized, by statute or decision, for confidential disclosures to psychiatrists, qualified psychologists trained in the treatment of mental disorders, and (in the court's discretion) general practitioners consulted for diagnosis or treatment of mental disease.
>
> . . .
>
> "A privilege of those receiving psychotherapy is necessary if the psychiatric profession is to fulfill its medical responsibility to its patients."

McCormick, Evidence § 99 at 213 n.9 (Cleary, 2d ed. 1972) (citations omitted); see also, e. g., Slovenko, Psychiatry and a Second Look at the Medical Privilege, 6 Wayne L.Rev. 175 (1960); Note, Confidential Communications to a Psychotherapist: A New Testimonial Privilege, 47 Nw.U.L. Rev. 384 (1952); Guttmacher and Weihofen, Privileged Communications Between Psychiatrist and Patient, 28 Ind.L.J. 32 (1952); Cross, Privileged Communications Between Participants in Group Psychotherapy, 1970 L. & Soc. Order 191. Speaking of similar problems presented by the requirement of filings respecting abortions, the New York Court of Appeals remarked:

> The record is completely devoid of any proof that the name requirement dissuades potential abortion recipients from obtaining abortions in New York City. Petitioners advance only unsubstantiated allegations of subjective chill . . . .

*Schulman v. New York City Health & Hosp. Corp.*, 38 N.Y.2d 234, 240, 379 N.Y. S.2d 702, 706, 342 N.E.2d 501, 504 (1975). In the case before us, those persons in charge of gathering the data agreed that students and their families may be reluctant to give personal information to guidance counselors, psychologists, social workers, psychiatrists or their associates for many reasons, but that fear of use in any possible court proceeding is not a factor of any substantial importance.

Just such assumptions about how people act in the real world led the Advisory Committee on the Federal Rules of Evidence to reject a general doctor-patient privilege, although it did propose a psychotherapist-patient privilege. The committee noted:

> The rules contain no provision for a general physician-patient privilege. While many states have by statute created the privilege, the exceptions which have been found necessary in order to obtain information required by the public interest or to avoid fraud are so numerous as to leave little if any basis for the privilege.
>
> *       *       *       *       *       *
>
> The doubts attendant upon the general physician-patient privilege are not present when the relationship is that of psychotherapist and patient. While the common law recognized no general physician-patient privilege, it had indicated a disposition to recognize a psychotherapist-patient privilege . . . when legislatures began moving into the field.

The case for the privilege is convincingly stated in Report No. 45, Group for the Advancement of Psychiatry 92 (1960):

> Among physicians, the psychiatrist has a special need to maintain confidentiality. His capacity to help his patients is completely dependent upon their willingness and ability to talk freely. This makes it difficult if not impossible for him to function without being able to assure his pa-

tients of confidentiality and, indeed, privileged communication. Where there may be exceptions to this general rule . . . , there is wide agreement that confidentiality is a *sine qua non* for successful psychiatric treatment. The relationship may well be likened to that of the priest-penitent or the lawyer-client. Psychiatrists not only explore the very depths of their patients' conscious, but their unconscious feelings and attitudes as well. Therapeutic effectiveness necessitates going beyond a patient's awareness and, in order to do this, it must be possible to communicate freely. A threat to secrecy blocks successful treatment. . . . The conclusion is reached that Wigmore's four conditions needed to justify the existence of a privilege are amply satisfied.

56 F.R.D. 183, 241–42 (1973) (citations omitted).

The testimony in this case indicates that the Advisory Committee's justification for the psychiatrist-patient privilege should probably be limited to therapy and diagnosis preparatory to possible therapy and should probably not encompass diagnosis for the purpose of screening and referral within New York City's educational system. It seems apparent that the students and their families would have given school personnel the same information and cooperation whatever the applicable law of privileges and whatever their perception of that law.

The State of New York does recognize and afford protection to psychiatrist-patient communications through its general physician-patient privilege, N.Y.C.P.L.R. 4504, as well as through a specific privilege for registered psychologists, N.Y.C.P.L.R. 4507. In addition, communications of a psychotherapeutic nature made to a certified social worker in the course of his or her professional duties are afforded confidential status. N.Y.C.P.L.R. 4508.

■ While it is true that "in any given instance the special federal interest in seeking the truth in a federal question case may require disclosure despite the existence of a state rule holding the same communications privileged," *Carr v. Monroe Manufacturing Co.*, 431 F.2d 384, 388 (5th Cir. 1970), *cert. den. sub nom., Aldrige v. Carr*, 400 U.S. 1000, 91 S.Ct. 456, 27 L.Ed.2d 451 (1971), we acknowledge that "a strong policy of comity between state and federal sovereignties impels federal courts to recognize state privileges where this can be accomplished at no substantial cost to federal substantive and procedural policy." *United States v. King*, 73 F.R.D. 103, 105 (E.D.N.Y.1976); *cf. Apicella v. McNeil Laboratories, Inc.*, 66 F.R.D. 78 (E.D.N.Y.1975). If the state holds out the expectation of protection to its citizens, they should not be disappointed by a mechanical and unnecessary application of the federal rule.

### 2. Balancing Generally

■ Whether claims to privacy and privilege of the sort made here are ultimately rooted in the Constitution, or in non-constitutional considerations of public policy, they are in no event absolute. Like rights and interests generally, they are qualified and must be balanced against legitimate and weighty competing private and state interests. As Justice Powell noted in his concurring opinion in *Branzburg v. Hayes*, 408 U.S. 665, 92 S.Ct. 2646, 33 L.Ed.2d 626 (1972):

The balance of . . . vital constitutional and societal interests on a case-by-case basis accords with the tried and traditional way of adjudicating such questions.

408 U.S. at 710, 92 S.Ct. at 2671 (footnote omitted). *Cf. Garland v. Torre*, 259 F.2d 545, 550 (2d Cir.), *cert. denied*, 358 U.S. 910, 79 S.Ct. 237, 3 L.Ed.2d 231 (1958); *Davis v. Alaska*, 415 U.S. 308, 94 S.Ct. 1105, 39 L.Ed.2d 347 (1974); N.Y.C.R.R. § 2501–36.-3(b) ("Any person or agency having a legitimate purpose may for good cause shown and in the discretion of the court have access to the records of any Family Court proceedings").

By its very nature the need for privacy must inevitably conflict with society's compelling need for information in a myriad of circumstances.

The claim to privacy will always be embattled—its collision with the community's need to know is classic and continuous. Man has always lived in a community, and the community has always required some forfeiture of freedom, including that of privacy. It is, indeed, a fact of life that there has never been a condition of complete privacy for the individual insofar as he is a normal man living with other men. At one time or another, privacy has yielded—as it must—to the positive group needs for security, for order, for sustenance, for survival. The degree of privacy granted throughout history to an individual by one or another community has varied markedly with the nature of the political system, the economic level, the population density and the characteristics of the environment.

It should also be recognized that not every threat to private personality is a matter of sufficient concern to warrant social protection. Similarly, not every technical trespass is serious enough to warrant social redress. The test is always this: Is the threat or the invasion unreasonable, or intolerable?

Ruebhausen and Brim, Privacy and Behavioral Research, 65 Colum.L.Rev. 1184, 1190 (1965).

Whenever competing rights and values confront each other, it is always a slow and arduous process to evaluate the claim and counterclaim in real life situations. This process, however, is a classic function of the law. In time, therefore, the boundaries between the permissible and unreasonable interferences with privacy will be delineated just as hosts of similar conflicts have been resolved in the past.

*Id.* at 1186–87.

■ Balancing of competing interests is permissible, and in fact required, to determine whether a federal evidentiary privilege should be extended to particular communications as a matter of social and legal policy. This flexible nature of rules of privilege is often overlooked. They are sometimes mistakenly characterized as con-

ferring "absolute" or "unqualified" immunity.

### 3. Flexibility for Privileged Matters As Well As Work Product

In the discovery context, an excessively rigid distinction is sometimes drawn between the protection afforded material under the work-product doctrine of Federal Rule of Civil Procedure 26 and that provided by privileges for confidential communications. Only the former is thought to retreat as good cause is shown. *Kirkland v. Morton Salt Co.*, 46 F.R.D. 28 (N.D.Ga.1968) is typical in distinguishing the work-product doctrine from an evidentiary privilege on the basis of the flexibility of the former:

[*Hickman v. Taylor*, 329 U.S. 495, 67 S.Ct. 385, 91 L.Ed. 451 (1947)] set the balance between the "safeguards * * * established to preclude unwarranted excursions into the privacy of a man's work" and "reasonable and necessary inquiries" supported by public policy. . . . In approaching that "delicate and difficult task", the court showed a difference between the idea of strict privilege and grounds upon which "work product" could be discovered. It was shown that certain witnesses' statements taken by an attorney were not privileged, and yet were not discoverable upon the broader policy ground that "good cause" was not shown. It is that ground which is the main thrust of *Hickman v. Taylor*, giving a lawyer's work product a *qualified immunity* rather than a *privilege*, with qualifications to be determined upon the question of necessity or good cause as shown by the facts in each case. Privilege has its basis in rules of evidence, which, according to the *Hickman* court, should not control discovery in every particular. As to an attorney's work product, its immunity retreats as necessity and good cause is shown for its production in a balance of competing interests.

46 F.R.D. at 29–30 (emphasis in original). *See also* Wright and Miller, Federal Practice and Procedure, § 2025 at 211–212. It is true that in most situations characterizing

578

material as work product does give the court more freedom to authorize discovery than does denominating it privileged. Once, however, it is recognized that privileges themselves do not always provide rigid barriers to knowledge, the distinction in terms of flexibility becomes somewhat blurred.

Absolute rules, whether of evidence or otherwise, do not provide the best resolutions of conflicts of values. The "granting or withholding of any privilege requires a balancing of competing policies." *Carr v. Monroe Manufacturing Co.*, 431 F.2d 384, 388 (5th Cir. 1970), *cert. den. sub nom., Aldridge v. Carr*, 400 U.S. 1000, 91 S.Ct. 456, 27 L.Ed.2d 451 (1971), citing 8 Wigmore, Evidence § 2285 at 527–28 (McNaughton rev. 1961). "The potential harm from disclosure of any communication subject to a privilege must be weighed against the benefits of disclosure." *Id.* at 390. "[E]ach case must stand on its own facts, with the courts balancing the public policy considerations . . . ." *Baird v. Koerner*, 279 F.2d 623, 632 (9th Cir. 1960). *Cf. United States v. Reynolds*, 345 U.S. 1, 73 S.Ct. 528, 97 L.Ed. 727 (1953); *Heathman v. U. S. Dist. Ct. for Cent. Dist. of Cal.*, 503 F.2d 1032 (9th Cir. 1974); *Fears v. Burris Manuf. Co.*, 436 F.2d 1357 (5th Cir. 1971); *Gaison v. Scott*, 59 F.R.D. 347 (D.Hawaii 1973); *Salazar v. Alaska*, 559 P.2d 66 (Alaska 1976). Flexibility is not precluded by the characterization of a matter as privileged.

### 4. *Federal Rules of Evidence*

This case is controlled by Federal Rule of Evidence 501. As modified by Congress, it requires the courts to consider "reason and experience" in developing and applying rules of privilege.

#### GENERAL RULE

Except as otherwise required by the Constitution of the United States or provided by Act of Congress or in rules prescribed by the Supreme Court pursuant to statutory authority, the privilege of a witness, person, government, State, or political subdivision thereof shall be governed by the principles of the common law as they may be interpreted by the courts of the United States in the light of reason and experience.

In federal rule of decision cases, courts must continue to develop recognized privileges, as well as to formulate new privileges, on a case-by-case basis. *Cf. United States v. King*, 73 F.R.D. 103 (E.D.N.Y. 1976). In performing that task in this case "reason and experience" dictate a balancing of the public and private interests involved.

Of all the factors in the balancing equation, the most constant is the need for full development of the facts in federal litigation in order that the paramount public interest in the fair administration of justice be served. The Supreme Court has noted:

The right to sue and defend in the courts is the alternative of force. In an organized society it is the right conservative of all other rights, and lies at the foundation of orderly government.

*Chambers v. Baltimore & Ohio Railroad Co.*, 207 U.S. 142, 148, 28 S.Ct. 34, 35, 52 L.Ed. 143 (1907). At the foundation of that right "are courts of justice, armed with the power to discover truth." *Garland v. Torre*, 259 F.2d 545, 548 (2d Cir.), *cert. denied*, 358 U.S. 910, 79 S.Ct. 237, 3 L.Ed.2d 231 (1958).

The core provisions of the Federal Rules of Evidence were chiefly designed to serve this fundamental and comprehensive need in our adversary system to develop all relevant facts before the trier. The primary provisions read as follows:

#### Rule 102.

#### PURPOSE AND CONSTRUCTION

These rules shall be construed to secure fairness in administration, elimination of unjustifiable expense and delay, and promotion of growth and development of the law of evidence *to the end that the truth may be ascertained* and proceedings justly determined.

Rule 401.

## DEFINITION OF "RELEVANT EVIDENCE"

"Relevant evidence" means *evidence having any tendency to make the existence of any fact that is of consequence to the determination of the action more probable . . . than it would be without the evidence.*

Rule 402.

## RELEVANT EVIDENCE GENERALLY ADMISSIBLE: IRRELEVANT EVIDENCE INADMISSIBLE

*All relevant evidence is admissible, except as otherwise provided* by the Constitution of the United States, by Act of Congress, by these rules, or by other rules prescribed by the Supreme Court pursuant to statutory authority. . . .

(Emphasis supplied.)

Only recently the Supreme Court emphasized the strong policy in favor of full development of the facts in federal litigations to the end that justice be served. It observed in *United States v. Nixon,* 418 U.S. 683, 709, 94 S.Ct. 3090, 3108, 41 L.Ed.2d 1039 (1974):

> We have elected to employ an adversary system of criminal justice in which the parties contest all issues before a court of law. *The need to develop all relevant facts in the adversary system is both fundamental and comprehensive.* . . . *The very integrity of the judicial system and public confidence in the system depend on full disclosure of all the facts, within the framework of the rules of evidence.*

(Emphasis supplied.) *Cf. United States v. King,* 73 F.R.D. 103 (E.D.N.Y.1976).

In addition to the strong need for all relevant evidence in litigation generally, this case involves significant issues specially affecting the public interest. Primary education is a public function that is of vital importance to all citizens, and for more than two decades this nation has charted a course to eradicate racial discrimination in our schools. *Cf. Brown v. Board of Educa-*

*tion,* 347 U.S. 483, 74 S.Ct. 686, 98 L.Ed. 873 (1954); *Green v. County School Board,* 391 U.S. 430, 88 S.Ct. 1689, 20 L.Ed.2d 716 (1968); *Swann v. Charlotte-Mecklenburg Board of Education,* 402 U.S. 1, 91 S.Ct. 1267, 28 L.Ed.2d 554 (1971); *Keyes v. School District No. 1,* 413 U.S. 189, 93 S.Ct. 2686, 37 L.Ed.2d 548 (1973); *Hart v. Community School Board,* 512 F.2d 37 (2d Cir. 1975).

Remedial education of the emotionally disturbed and handicapped, if tainted by capricious or discriminatory administration, may have devastating consequences not only for the victimized students, but for society generally. The possibility that SMED schools are, as plaintiffs allege, responsible for a tragic waste of human resources and the concomitant threat to physical well-being and social order posed by a class of ill-educated, emotionally disturbed outcasts, make accurate fact finding in this case imperative.

■ Only strong countervailing public policies should be permitted to prevent disclosure when, as here, a suit is brought to redress a claim for violation of civil rights under the Constitution. 42 U.S.C. § 1983. Enforcement is by private individuals but they are acting in the capacity of "private attorneys-general." *Gaison v. Scott,* 59 F.R.D. 347, 352. (D.Hawaii 1973).

### 5. *Protecting Reasonable Interests of Persons Claiming Privilege*

■ In determining whether disclosure in this case will unreasonably interfere with justifiable privilege expectations of students and their families four significant factors must be considered. First, is the identification of the individuals required for effective use of the data? Second, is the invasion of privacy and risk of psychological harm being limited to the narrowest possible extent? Third, will the data be supplied only to qualified personnel under strict controls over confidentiality? Fourth, is the data necessary or simply desirable?

Plaintiffs have admitted that their need for clinical and other data does not encom-

pass the identity of the subject students. As a practical matter, then, the court may grant discovery but order that each file be coded for identification, and that all references to each child's identity be redacted.

Most persons protest not the mere disclosure of private embarrassing or damaging information, but rather the concomitant disclosure of identifying data. *Doe v. McMillan*, 412 U.S. 306, 93 S.Ct. 2018, 36 L.Ed.2d 912 (1973), is illustrative. In that case, a report about the Washington, D.C. school system, authorized by Congressional resolution and published and distributed by the Government Printing Office, included documents relating to disciplinary problems of specifically named students. Petitioners, the parents of the named children, alleged violation of statutory, constitutional, and common-law rights of privacy. The parents sought

> only to prohibit use of the children's names without their consent. They do not contest the propriety of the investigation generally, nor do they seek to enjoin the conclusions or text of the report. Indeed, they do not even challenge the right of Congress to examine and summarize the confidential material involved. They wish only to retain their anonymity.

148 U.S.App.D.C. 280, 459 F.2d 1304, 1324 (1972) (Wright, J., dissenting).

■ This desire of the individual to prevent disclosure of his identity in a damaging context has been protected under the federal statutory and case law. *See, e. g., Talley v. California*, 362 U.S. 60, 80 S.Ct. 536, 4 L.Ed.2d 559 (1960); *NAACP v. Alabama*, 357 U.S. 449, 78 S.Ct. 1163, 2 L.Ed.2d 1488 (1958); 20 U.S.C. § 1232g(b)(2) ("No funds shall be made available under any applicable program to any educational agency or institution which has a policy or practice of releasing, or providing access to, any *personally identifiable* information in education records . . . ."); 42 U.S.C. § 5658 ("Records containing the *identity* of individual juveniles gathered for purposes pursuant to this subchapter may under no circumstances be disclosed or transferred to any individual or other agency, public, or

private."); 42 U.S.C. § 5732 ("Records containing the *identity* of individual runaway youths gathered for statistical purposes pursuant to section 5731 of this title may under no circumstances be disclosed or transferred to any individual or to any public or private agency."); 21 U.S.C. § 872(c) ("The Attorney General may authorize persons engaged in research [related to drugs or other substances which are or may be subject to control under this title] to withhold the *names and other identifying characteristics* of persons who are the subjects of such research. Persons who obtain this authorization may not be compelled in any Federal, State or local civil, criminal, administrative, legislative, or other proceeding to *identify* the subjects of research for which such authorization was obtained."); 42 U.S.C. § 242a(a) ("The Secretary [of Health, Education and Welfare] may authorize persons engaged in research on mental health, including research on the use and effect of alcohol and other psychoactive drugs, to protect the privacy of individuals who are the subject of such research by withholding from all persons not connected with the conduct of such research *the names or other identifying characteristics of such individuals.* Persons so authorized to protect the privacy of such individuals may not be compelled in any Federal, State, or local civil, criminal, administrative, legislative, or other proceedings to *identify* such individuals.") (emphasis supplied).

Numerous cases suggest the heavy burden assumed by those making privacy claims based upon the disclosure of anonymous information. *Utz v. Cullinane*, 172 U.S.App.D.C. 67, 520 F.2d 467 (1975), for example, involved constitutional and statutory challenges to the policy of Washington, D.C.'s Metropolitan Police Department of routinely transmitting to the Federal Bureau of Investigation the fingerprint cards and accompanying identification data of individuals arrested for local criminal offenses. In his opinion for the District Of Columbia Court of Appeals, Judge Wright, in dictum, acknowledged the "substantial merit" of appellants' claim that the practice violated their constitutional right to priva-

cy. 520 F.2d at 469. The opinion placed repeated emphasis on the identifiable nature of the information, and stressed that:

> appellants do not suggest that the Metropolitan Police Department is prohibited from routinely disseminating more limited categories of data to the FBI [; f]or example, routinely transmitting to the FBI the fingerprints or names (*without identifying data*) of individuals apprehended in this jurisdiction  . . . .

520 F.2d at 475 (emphasis supplied).

Similarly, in *Department of the Air Force v. Rose*, 425 U.S. 352, 96 S.Ct. 1592, 48 L.Ed.2d 11 (1976), a suit under the Freedom of Information Act, the Supreme Court held that disclosure of material contained in personnel and medical files that would otherwise "constitute a clearly unwarranted invasion of privacy," would be permissible where the names and identifying characteristics of the subjects were deleted. 425 U.S. at 375, 96 S.Ct. at 1605–1606. *Cf. National Prison Project of Am. Civ. Lib. Union, Inc. v. Sigler*, 390 F.Supp. 789 (D.C.C.1975).

Although medical practitioners maintain that their discipline mandates strict confidentiality, they have regularly published patients' case histories in both scientific journals and the popular press. The rationale behind this apparent anomaly, as indicated in the medico-legal literature, is that physicians deem their obligation of secrecy to be met if they withhold their patients' names and other identifying information from publication. *Cf.* Slovenko, Psychotherapy and Confidentiality, 24 Clev.S.L. Rev. 375, 382–87 (1975); R. Slovenko, Psychotherapy, Confidentiality, and Privileged Communication 64 (1966) ("Psychiatrists . . . are obliged to disguise their clinical data to avoid the recognition of the patient even though it involves detriment to the scientific value of the material  . . . The doctrine of privacy prohibits the public use of *identifying* characteristics of any individual unless his prior consent has been obtained.") (emphasis supplied); Freed, A Legal Structure for a National Medical Data Center, 49 Boston U.L.Rev. 80, 81 (1969) ("The practitioners' obligation requires that they avoid disclosing medical information associated with the patient's identity without authorization."); Powledge, The Therapist As Double Agent, Psychology Today, July 1977, pp. 44–47. By implication, a physician has breached no duty to his patient if the personal data disclosed does not destroy anonymity.

The same view is reflected in many professional requirements and guidelines on medical-related confidentiality. The American Medical Association Model State Bill on Confidentiality of Health Care Information, for example, provides:

> (b) No consent for release or transfer of confidential health care information is required in the following situations:
>
> \*      \*      \*      \*      \*      \*
>
> (4) to qualified personnel for the purpose of conducting scientific research, management audits, financial audits, program evaluations, or similar studies, *but such personnel shall not identify, directly or indirectly, any individual patient in any report of such research, audit, or evaluation, or otherwise disclose patient identities in any manner.*

(emphasis supplied). *Cf.* HEW Draft Policies on Confidentiality for Professional Standards Review Organizations, 1975 ("For the purposes of this paper, the following definitions shall apply: D. Privileged Data and Information. Medical data and information *identifiable to an individual patient*, data and information indicating patterns of health care practices *identifiable to individual health care practitioners*, records of PSRO determinations *identifiable to individual health care practitioners* and data and information collected and/or generated for medical care evaluation studies as defined in department regulations and guidelines."); ACLU Policy on Privacy of Medical Records ("C. Persons other than the patient may have access to the patient's medical records only: (4) if material from the records is to be used in connection with medical or scholarly research, or publication of a case history, or any other related writing, *in which event the identity of the patient must be disguised* in accordance with

appropriate professional standards, and subject to professional disciplinary review."); Guidelines on Preserving Confidentiality of Medical Records, National Association of Blue Shield Plans, Approved September 3, 1975 ("3. It is frequently necessary to release medical data for purposes of research for the study of utilization trends. The data must not, however, *identify* patient, subscriber or physician.") (emphasis supplied).

General lack of professional and legal acknowledgment of any personal interest in unidentifiable data is significant but not controlling. There may be instances unlike the one presently before us where restricting identification will not be enough. It is erroneous to assume that all individuals at all times have no subjective desire to prevent dissemination of personal information, however intimate in nature, so long as anonymity is preserved. A pertinent analogy is found in the behavioral sciences, where many subjects resist even anonymous revelations of certain data to researchers. This phenomenon has been noted by, among others, Ruebhausen and Brim:

A special word should be said about anonymity in behavioral research. Frequently it is possible to obtain data of value for behavioral research where the subjects need never be identified by name. National opinion surveys are one example; the use of students in a college classroom may be another. Where anonymity in fact exists, the invasion of privacy involved in behavioral research might well be regarded as *de minimis*. Nevertheless, it must be stressed that anonymity is not a complete substitute for consent. On occasion an individual may feel that his privacy is being invaded when asked to reveal his thoughts or feelings, or to describe his actions, even though he remains quite anonymous to the researcher. It is a fact that many people even under conditions of anonymity resist such revelation to others. So it would seem that, wherever possible, both consent and anonymity should be sought in behavioral research.

The condition of anonymity sometimes is used as a justification for the invasion of privacy in psychological experiments where the subject is deceived as to the meaning of the experiment, or where false information is given to the person so as experimentally to arouse or decrease self-esteem, motivation, or other similar feelings. That the subject remains anonymous, however, cannot justify the failure to obtain his consent prior to any such purposeful manipulation of his personality.

Ruebhausen and Brim, Privacy and Behavioral Research, 65 Colum.L.Rev. 1184, 1200–01 (1965) (footnotes omitted). *Cf.* Anastasi, Psychological Testing 551 (Third Edition, 1968) ("Anonymity does not . . solve the problem of protecting privacy in all research contexts. Some subjects may resent the disclosure of facts they consider personal even when complete confidentiality of response is assured.").

Anonymity, while undoubtedly reducing the degree of invasion of privacy attendant upon dissemination, does not necessarily, then, reduce that invasion to zero. Discovery of the redacted files might, therefore, conceivably impinge upon the child's right to privacy, although that child remains unidentifiable. Given, however, the broad powers and duty of this court to fashion "protective orders that will give appropriate regard to the privacy and dignity of the individuals affected," *Carr v. Monroe Manufacturing Co.*, 431 F.2d 384, 390 (5th Cir. 1970), *cert. den. sub nom., Aldridge v. Carr*, 400 U.S. 1000, 91 S.Ct. 456, 27 L.Ed.2d 451 (1971), this impact can be kept to a minimum.

In addition to requiring that all identifying data be redacted and the files coded, the court may order that the information they contain be used solely for the purpose of the pending litigation; strict confidentiality may be enforced under penalty of contempt; the number of copies to be made of the documents may be rigidly regulated; files submitted to the court may be ordered sealed; and all material may be required to be returned to the defendants

immediately upon conclusion of this suit. Under such a protective scheme the invasion of the children's privacy will be minimal. *Cf. Carr v. Monroe Manufacturing Co.*, 431 F.2d 384 (5th Cir. 1970), *cert. den. sub nom. Aldridge v. Carr*, 400 U.S. 1000, 91 S.Ct. 456, 27 L.Ed.2d 451 (1971).

### 6. *Lack of Adverse Impact on State Policy of Fostering Relationship Between Student and Therapist*

The impact of disclosure on the state policy of fostering psychotherapeutic consultation, if not negligible, is certainly of insufficient scope to require denial of reasonable discovery. Any argument that permitting plaintiffs' experts to examine redacted files will adversely affect future diagnosis and treatment of disturbed school children must rely on the premise that such communications are made in conscious reliance on legal or professional guarantees of strict confidentiality. Defendants have, however, furnished the court with no evidence that students are promised such confidentiality prior to screening and counselling sessions, or are informed that their communications are privileged under state law. The contrary situation exists—students, their parents and professionals employed by the Board of Education to assemble these files all assume that they may be used in administrative and court hearings and that they will be seen by educational personnel of schools the students attend. We have no reason to believe that disadvantaged, emotionally disturbed and educationally handicapped children or their parents are independently aware of any privilege, or if aware, credit it sufficiently to rely on it.

Furthermore, even assuming reliance on confidentiality, the fact remains that we do not here propose to judicially sanction an all-encompassing exposure of identifiable student-patient records of the scope that might have a substantial chilling effect on future psychotherapy. Rather, potential patients, if they are at all aware of or affected by the instant decision, will be assured that their confidences and names

will be substantially protected by an impartial judicial determination when there is a compelling social need for the data to be divulged in court.

That such an awareness of limited compellability in a federal litigation will have even the slightest deterrent impact on state policy is most unlikely. We are aware of no empirical data indicating that absolute unbroachable privacy is required for effective diagnosis and therapy. The contrary is suggested by the use that is commonly made of consensual pre-treatment agreements limiting confidentiality, and the great success of group therapy, which is carried out with only minimal guarantees of non-disclosure.

[A]n element of psychotherapy usually assumed essential is the patient's trust that matters disclosed in therapy will be held in strictest confidence. Most would agree that conducting effective therapy on stage in front of an audience is unthinkable. This does not mean, however, that without total privacy therapy cannot be effective; certainly it is a matter of degree. Pre-treatment agreements limiting the confidentiality within which therapy will be conducted are not at all unusual. The very possibility of voluntarily constricting confidentiality, let alone the success claimed through the use of this method, would appear to place the interference concern on somewhat shaky ground.

An examination of the role of confidentiality in group therapy further undermines the interference argument. In group therapy, the therapist conducts simultaneous treatment for a number of patients, who often (and preferably) have some characteristics in common, using interactions between patient and therapist or among the patients themselves as means for exposing and solving problems confronting members of the group. Despite the fact that groups are usually instructed to maintain internal confidentiality, this method of therapy is typically conducted in an environment less conducive to full confidentiality than that of individual psychotherapy. Numbers

alone increase the chances of an improvident disclosure outside. Moreover groups, especially family groups, often contain individuals whose interests are at variance, or may in fact be directly in conflict, with those of others in the group. Personal disclosures in such a highly volatile atmosphere run a substantial risk of being revealed outside therapy. Despite this danger each member is expected to respond in group therapy as fully as he would in private therapy, and great success is claimed from this process. . . . [T]he group therapy experience strongly suggests that effective treatment is possible in an environment where the patient has little assurance that disclosures will be held in strictest confidence.

Fleming & Maximov, The Patient or His Victim: The Therapist's Dilemma, 62 Cal.L. Rev. 1025, 1041–43 (1974) (footnotes omitted). *See also* Cross, Privileged Communications Between Participants in Group Psychotherapy, 1970 L. & Soc. Order 191.

While the impact of disclosure on the state and personal interests implicated is legally insignificant, even such minimal intrusion might be sufficient ground for denying discovery if plaintiffs had failed to demonstrate a genuine need for the material, or that the information sought is unavailable from an alternative source. *Cf. Apicella v. McNeil Laboratories, Inc.,* 66 F.R.D. 78 (E.D.N.Y.1975). Here plaintiffs have alleged that their individual claims for relief arise as a result of system-wide racial discrimination and denial of equal educational opportunity. Manifestly, the best evidence of the actual criteria used in the SMED evaluation and placement process rests in the referral and diagnostic files sought by plaintiffs. In fact, it is apparent that those files are the sole available reliable source of much of such information.

A recent federal case is instructive. In *Laufman v. Oakley Building and Loan Co.,* 72 F.R.D. 116 (S.D.Ohio 1976), an action based on the Fair Housing Act of 1968, 42 U.S.C. § 3601 *et seq.,* a sole plaintiff initiated an action alleging that defendant loan company had rejected his loan application because he sought to purchase a home in a racially integrated neighborhood. Although class action status had been previously denied, plaintiff sought class wide discovery to demonstrate that the loan company's lending policies and practices were based, in part, upon racial considerations. Noting that the information sought was relevant to plaintiffs' claims, the court stated:

[W]e should be wary of denying the plaintiffs full and adequate discovery based on defendants' undifferentiated fears and suspicions, lest we deny them their day in court. . . . [P]laintiffs in this case are entitled to discover facts relating to defendants' policies and practices with respect to transactions similar to the one in question, whether the present case is a class action or not, as they may tend to show a pattern of refusal to lend in integrated areas.

72 F.R.D. at 121 (citations omitted).

The reasoning of *Laufman* is persuasive. Plaintiffs must examine the files if they are to establish a pattern of racial discrimination in the SMED evaluation and placement process. Weighed against the compelling value of all relevant evidence in litigation generally, and the particular need for the specific material sought in this case, the individual privacy interests and state policies, though cognizable, cannot prevail, either as a constitutional or federal evidentiary matter.

### 7. The Specific Guidelines of Proposed Rule 504

Our opinion is strongly buttressed by consideration of Rule 504 of the Federal Rules of Evidence as promulgated by the Supreme Court. 56 F.R.D. 183, 240–41 (1973). Although Rule 504, along with other specific privilege rules, was rejected by Congress in favor of the more general Rule 501, it still provides a useful standard from which analysis can proceed. *Cf. United States v. King,* 73 F.R.D. 103, 109 (E.D.N.Y.1976). Consideration of the rationale and specific language of Rule 504 convinces us that it

would not have protected the material sought here. Proposed Rule 504 provided in part:

### PSYCHOTHERAPIST–PATIENT PRIVILEGE

\* \* \* \* \* \*

(b) General rule of privilege. A patient has a privilege to refuse to disclose and to prevent any other person from disclosing confidential communications, made for the purposes of diagnosis or treatment of his mental or emotional condition, including. drug addiction, among himself, his psychotherapist, or persons who are participating in the diagnosis or treatment under the direction of the psychotherapist, including members of the patient's family.

\* \* \* \* \* \*

(3) A communication is "confidential" if not intended to be disclosed to third persons other than those present to further the interest of the patient in the consultation, examination, or interview, or persons reasonably necessary for the transmission of the communication, or persons who are participating in the diagnosis and treatment under the direction of the psychotherapist, including members of the patient's family.

■ A crucial element of the privilege is intent. If a patient makes a communication expecting it to be disclosed to persons other than those excepted in subsection (3), there is no privilege. That such an expectation was entertained by students evaluated for SMED placement, or by their parents, seems significantly more probable than not. This conclusion is based in part on the absence, noted above, of affirmative evidence of reliance on professional and legal guarantees of confidentiality. In addition, the evaluation procedures in use up to a short time ago explicitly provided access to confidential data by, third parties to whom the privilege arguably does not extend. Board of Education directives provided in pertinent part:

[T]he Bureau of Child Guidance Worker . . . will forward . . . *clinical findings and copies of all pertinent records* to an Assignment Committee, which consists of a Borough Representative of the Bureau for Socially Maladjusted and Emotionally Disturbed Children and a Bureau of Child Guidance representative

Guidelines for Students Found to Require Placement in Special Day Schools for Socially Maladjusted and Emotionally Disturbed Children, Guideline 3.2 (emphasis supplied). In addition, Guideline 3.8 provided access to these records by the Day School principal. Present practice of the Office of Evaluation and Placement provides for much the same kind of dissemination, including use before administrative fair hearing panels designed to protect students' right to due process in assignment to SMED schools.

While each of the many people within the educational system who have access to the files is arguably "participating in the diagnosis and treatment" of the child, it is doubtful whether they are doing so "under the direction of the psychotherapist" to whom the communication was originally made, within the meaning of Rule 504. That rule contemplated a close supervisory relationship as a necessary condition for the extension of the privilege. Even assuming that Rule 504 would be satisfied in this respect, the very fact that this data is so widely disseminated suggests that students and their parents could harbor little subjective expectation of secrecy. The additional anonymous disclosure contemplated in this case cannot realistically be found to involve any disappointment of the conscious anticipations of the communicants.

■ Even if this conclusion is contrary to fact, and a valid privilege claim would have existed under Rule 504, it would have belonged to the students and their parents and could not be raised under the circumstances of this case by the defendants. Proposed Rule 504(c) provides:

\* \* \* \* \* \*

(c) Who may claim the privilege. The privilege may be claimed by the patient,

by his guardian or conservator, or by the personal representative of a deceased patient. *The person who was the psychotherapist may claim the privilege* but only *on behalf of the patient. His authority so to do. is presumed in the absence of evidence to the contrary.*

(Emphasis supplied.)

In this case, the situation in the City's SMED schools, whether or not the result, in whole or in part, of the illegal activities alleged in this suit, provides sufficient evidence to rebut the presumption that the "psychotherapist" may raise the privilege claim. *See* Federal Rules of Evidence, Rule 301. Most of the students assigned to SMED schools, whose racial composition is overwhelmingly Black and Hispanic, see themselves, according to plaintiffs' theory, as educational outcasts, abandoned by the regular school system and "remanded" to educational "holding pens", there to be incapacitated, rather than rehabilitated, until such time as they can be conveniently dumped, untrained and unfit, into a society which holds no proper place for them. While we make no finding on the point, the plaintiffs' attorneys claim to have at least some evidence to show that pupils generally share with their parents the view that assignment to SMED schools is racially motivated.

Whether or not these beliefs accurately reflect the facts, there is some reason to conclude that they are widely held, and it is highly unlikely that the fifty students to be randomly selected from this group would acquiesce in the assertion of a privilege by the very individuals alleged to have fostered such system-wide bias. The minimal invasion of privacy the students might suffer, weighed against their interest, even as non-parties, in an accurate determination of these charges, convinces us that they would reject this assertion of confidentiality on their behalf.

Given this view of the facts, it might appear desirable to limit examination of files to those subjects whose consent could actually be obtained. That path is foreclosed, however, since such a procedure would eliminate the necessary randomness of the sample. *See* Zeisel, Reducing the Hazards of Human Experiments Through Modifications in Research Design, 169 Annals N.Y. Acad. Sci. 475 (1970). Nor need we resort to the legal fiction that each student may be "deemed" to have consented. Rather, based on the evidence before us, we simply conclude that the presumption of authority contained in proposed Rule 504(c) is rebutted. Absent that presumption the privilege could not be raised on behalf of the students by these defendants.

Finally, even were we to assume that the communications were confidential and that the defendants could raise the privilege claim, Rule 504 would not have precluded discovery of anonymous, as opposed to identifiable, data. That the distinction between the identity of a communicant and the substance of his communication properly bears on the scope of an evidentiary privilege is clear from the attorney-client context, where the general rule is that the fact of the attorney's employment and the identity of the person employing him do not constitute confidential communications. *Colton v. United States*, 306 F.2d 633, 637 (2d Cir. 1962), *cert. denied*, 371 U.S. 951, 83 S.Ct. 505, 9 L.Ed.2d 499 (1963); *Behrens v. Hironimus*, 170 F.2d 627, 628 (4th Cir. 1948); *United States v. Pape*, 144 F.2d 778, 782 (2d Cir.), *cert. denied*, 323 U.S. 752, 65 S.Ct. 86, 89 L.Ed. 602 (1944). As McCormick and others have pointed out:

> The Rule exempting the fact of employment and the component facts such as the identity of the client from the curtain of the privilege, seems to be based upon a judicial consideration of the balance of conflicting policies.

McCormick, Evidence § 90 at 187 (Cleary, 2d ed. 1972); *cf. Mauch v. Commissioner of Internal Revenue*, 113 F.2d 555, 556 (3d Cir. 1940). Because a client may not ordinarily keep secret the fact that he has consulted a lawyer, the balance is generally drawn in favor of the much stronger public interest in disclosure. The reverse is undoubtedly true in the case of psychotherapy. As we have seen, it is identity, rather than anony-

mous communications, that patients generally wish to have shielded from exposure. Drawing the proper balance required by proposed Rule 504 would not, then, have prevented discovery of the redacted and suitably protected files.

### III. CONCLUSION

The balance of relevant factors in this case clearly falls on the side of compelled disclosure. Plaintiffs' motion for an order compelling production of fifty randomly selected anonymous diagnostic and referral files is granted. Appropriate protective orders in accordance with this opinion will protect the persons described in these files.

So ordered.