Janine PERRIGNON and Jamie Perrignon, by Janine Perrignon, her guardian ad litem, Plaintiff,

v.

BERGEN BRUNSWIG CORPORATION, a New Jersey Corporation, Health Applications Systems, Inc., a Delaware Corporation, Paid Prescriptions, Inc., a California nonprofit Corporation, Mazor, Barnes & Associates, and Joseph A. Mazor, Defendants.

Joseph A. MAZOR, Cross-Claimant,

v.

BERGEN BRUNSWIG CORPORATION, a New Jersey Corporation, Health Applications Systems, Inc., a Delaware Corporation, and Paid Prescriptions, Inc., a California nonprofit Corporation, Cross-Defendants.

No. C–77–0069–CBR.

United States District Court, N. D. California.

Jan. 12, 1978.

George C. Fisher, Blase, Valentine & Klein, Palo Alto, Cal., for plaintiffs.

Chris A. Tarkington, Russ, Tarkington & Daniels, Pettit, Evers & Martin, San Francisco, Cal., for Paid Prescriptions.

H. R. Lloyd, Jr., Hoge, Fenton, Jones & Appel, Inc., San Jose, Cal., Sheppard, Mullin, Richter & Hampton, Los Angeles, Cal., for Bergen Brunswig and Health Application Systems.

Joseph A. Mazor, in pro per.

## MEMORANDUM OF OPINION

RENFREW, District Judge.

On August 16, 1977, plaintiffs filed a motion for an order compelling answers to deposition questions, which the Court granted on October 13, 1977. Although this case was subsequently resolved by settlement after several days of jury trial, the Court believes that since the motion raised important questions under Rule 501 of the Federal Rules of Evidence, it should express its views in a written opinion.

Plaintiff Janine Perrignon is a former employee of defendants Bergen Brunswig Corporation ("BBC") and Health Applications Systems, Inc. ("HAS"). She and plaintiff Jamie Perrignon, her daughter, allege that defendants BBC, HAS, Paid Prescriptions, Inc. ("PPI"), Mazor, Barnes & Associates, and Joseph A. Mazor violated her privacy rights and intentionally harassed her because of her cooperation with

state and federal officials who were investigating certain practices of defendants, BBC, HAS, and PPI, all in violation of 18 U.S.C. § 2520, 42 U.S.C. § 1985(2), Cal. Const. art. I, § 1, Cal.Penal Code §§ 630 *et seq.*, and Cal.Civil Code §§ 45 and 46.

More specifically, plaintiffs allege that, during the course of her employment with defendants, plaintiff Janine Perrignon became aware of apparent illegal payments to one Charles A. Cubbler, an official of the Commonwealth of Pennsylvania; that she discussed her concern over these payments with James Nielsen, then house counsel for HAS; that she soon thereafter resigned her job when it became apparent that she could no longer function effectively as an employee of HAS; that she subsequently made statements to various state and federal officials concerning her employment with HAS; and that, as a result of her statements, defendants instituted a program of surveillance of plaintiffs, intercepted telephone conversations initiated and received by plaintiffs, and conducted a campaign to intimidate and malign plaintiffs in order to suppress plaintiff Janine Perrignon's testimony as to the practices of BBC, HAS, and PPI. Plaintiffs seek special, statutory, general and exemplary damages.

On May 24, 1977, plaintiffs deposed James Nielsen, former house counsel for HAS. On the basis of the attorney-client privilege held by HAS, Nielsen refused to answer questions concerning (1) payments made by BBC and HAS to Cubbler; (2) conversations between Nielsen and plaintiff Janine Perrignon; (3) the drafting of certain documents by one William T. Ward, then Vice-President, Operations, of HAS; and (4) documents prepared by Nielsen concerning the areas included in (1), (2), and (3) above.

Plaintiffs deposed Robert Abrams, former President of HAS and presently President of PPI, on June 13, 1977. During his deposition, Abrams was questioned about conversations he had had with Nielsen concerning payments made by HAS through Harry Colby, then Vice-President of HAS, to Cubbler. Counsel for PPI objected to such questions on the basis of the attorney-client privilege. Abrams' personal attorney raised a similar objection, as did counsel for BBC and HAS. When Abrams expressed doubt as to whether or not he should answer the questions, his personal attorney instructed him to answer, whereupon Abrams proceeded to describe a conversation he had had with Nielsen concerning payments made by HAS through Colby to Cubbler.

Plaintiffs subsequently moved for an order compelling Nielsen to answer those questions which he had refused to answer during his deposition. Defendants BBC and HAS filed points and authorities in opposition to the motion, and the arguments of counsel were heard on September 15, 1977. On September 22, 1977, plaintiffs filed a supplemental memorandum in support of their motion.

■ On October 13, 1977, with the parties before the Court on another motion, the Court granted plaintiffs' motion to compel answers and ordered Nielsen to answer questions concerning (1) statements made to him by plaintiff Janine Perrignon during the time that both of them were employees of HAS; and (2) statements made to him by Abrams regarding alleged payments from HAS and PPI to Cubbler. The Court also ordered Nielsen to answer those questions set forth in Appendix A.[1]

---

**1.** Nielsen had claimed the privilege as to all of the questions set forth in Appendix A. Although some of the information sought by these questions goes beyond statements made to Nielsen by plaintiff Janine Perrignon during the time that both of them were employees of HAS and statements made by Abrams regarding payments made by HAS or PPI to Cubbler, defendants have not shown that the "additional" information is privileged.

The burden of establishing the existence of an attorney-client privilege rests on the claimant of the privilege who resists disclosure of shielded communication. *United States v. Gurtner*, 474 F.2d 297, 298 (9 Cir. 1973). Plaintiffs in their motion asked the Court to order Nielsen to answer those questions set forth in Appendix A. Defendants made no attempt to persuade the Court that the "additional" information sought by these questions was privi-

This opinion will set forth the Court's reasons for its order. In summary, the Court concluded that federal law controlled the issues presented. Under the applicable law, no privilege existed as to communications between plaintiff Janine Perrignon and Nielsen. As to the communications between Abrams and Nielsen, while the communications were originally protected by the attorney-client privilege, HAS waived its privilege during Abrams' deposition.

## I. Choice of Law

As a threshold matter, the Court had to decide whether to apply the federal common law of privileges or the California law of privileges. Rule 501 of the Federal Rules of Evidence provides that:

"Except as otherwise required by the Constitution of the United States or provided by Act of Congress or in rules prescribed by the Supreme Court pursuant to statutory authority, the privilege of a witness, person, government, State, or political subdivision thereof shall be governed by the principles of the common law as they may be interpreted by the courts of the United States in the light of reason and experience. However, in civil actions and proceedings, with respect to an element of a claim or defense as to which State law supplies the rule of decision, the privilege of a witness, person, government, State, or political subdivision thereof shall be determined in accordance with State law."

If this were a pure federal question case, then under Rule 501 the federal common law of privileges would have applied. Conversely, if this were a diversity case in which only state claims were raised, state law would have governed. *Commercial Union Insurance Co. of America v. Talisman, Inc.,* 69 F.R.D. 490, 491 (E.D.Mo.1975). Here, however, both federal and state claims are raised, and the information sought from Nielsen apparently goes to both federal and state claims. Since state law applies with and only with respect "to an element of a claim or defense as to which State law supplies the rule of decision," Rule 501 literally read would appear to require the Court to apply the federal common law of privileges with respect to the federal claims and the California law of privileges with respect to the state claims.

■ Such a dual application was not intended by Congress, however. The law of privileges is not just a rule governing the admissibility of evidence. Its primary purpose is to protect the confidentiality of certain communications under circumstances where such confidentiality serves broad societal goals. If a communication were privileged under state law but not under federal law, or if a communication were privileged under federal law but not under state law, it would be meaningless to hold the communication privileged for one set of claims but not for the other. Once confidentiality is broken, the basic purpose of the privilege is defeated.

■ The Court therefore had to apply either federal or California law with respect to the issues presented. Counsel has cited and independent research has disclosed no decision addressing the choice of law question in a case involving both federal and state claims after the enactment of Rule 501. The legislative history of Rule 501 does not shed much more light on the question. Neither the House Report, H.R.Rep. No.650, 93d Cong., 1st Sess. 8, reprinted in [1974] U.S.Code Cong. & Admin.News, p. 7082, nor the Conference Report, H.R.Rep. No.1597, 93d Cong., 2d Sess. 7, reprinted in [1974] U.S.Code Cong. & Admin.News, p. 7100, addressed the question. While the Senate Judiciary Committee stated in its report that "the Federal law of privileges should be applied with respect to pendent State law claims when they arise in a Federal question case," S.Rep.No.1277, 93d Cong., 2d Sess. 12 n.16, reprinted in [1974] U.S.Code Cong. & Admin.News, p. 7059 n.16, this statement was made in reference

---

leged. Defendants therefore have not met their burden of establishing that the attorney-client privilege prevents the disclosure of the "additional" information sought by these questions.

to the Senate's version of Rule 501,[2] which was rejected in the Conference Report. Consequently, the Senate Judiciary Committee's statement provides no evidence of congressional intent with respect to Rule 501 as it was ultimately enacted.

In the absence of any indication as to legislative intent in the language or legislative history of Rule 501, the Court believes that in federal question cases where pendent state claims are raised the federal common law of privileges should govern all claims of privilege raised in the litigation. This was the approach suggested by the Senate Judiciary Committee [see S.Rep.No. 1277, 93d Cong., 2d Sess. 12 n. 16, reprinted in [1974] U.S.Code Cong. & Admin.News, p. 7059 n. 16], and it seems to be the approach most consistent with the policy of Rule 501. That policy, simply stated, is that "[i]n non-diversity jurisdiction civil cases, federal privilege law will generally apply." H.R. Rep.No.1597, 93d Cong., 2d Sess. 7, reprinted in [1974] U.S.Code Cong. & Admin.News, p. 7101. It should not be cast aside simply because pendent state claims are raised in what is primarily a federal question case.

II.  *Claims of Privilege*

Having decided that federal law governed the issues presented, the Court then had to decide whether, under federal law, Nielsen properly invoked the attorney-client privilege. The two categories of information for which defendants have raised a serious claim of privilege are (1) statements made to Nielsen by plaintiff Janine Perrignon and (2) statements made to Nielsen by Abrams regarding alleged payments by HAS and PPI to Cubbler.

■  As to the first category, the statements were not privileged. Statements made by an employee of a corporation are protected by the corporation's attorney-client privilege only if the employee is a member of the control group of the corpo-

ration, see *City of Philadelphia v. Westinghouse Electric Corp.,* 210 F.Supp. 483, 485 (E.D.Pa.1962), or if the employee made the communication at the direction of superiors and the subject matter dealt with in the communication was the performance of the employee's duties of employment, see *Harper & Row Publishers, Inc. v. Decker,* 423 F.2d 487, 491–492 (7 Cir. 1970). Plaintiff Janine Perrignon was not a member of the control group of HAS, and her statements were not made at the direction of superiors and did not deal with her duties of employment.

■  Moreover, even if the statements were privileged, the privilege was waived. When plaintiff Janine Perrignon was deposed on April 21, 1977, she described her conversations with Nielsen without objection from counsel for HAS. By failing to make a timely objection, HAS waived any privilege that may have existed with respect to the statements. *United States v. Gurtner,* 474 F.2d 297, 299 (9 Cir. 1973).

The primary dispute between the parties was over the second category of information, statements made to Nielsen by Abrams regarding alleged payments made by HAS and PPI to Cubbler. It was not disputed that the conversations between Nielsen and Abrams were initially privileged. Abrams, as president of HAS, was clearly within the control group of the corporation. *Garrison v. General Motors Corp.,* 213 F.Supp. 515 (S.D.Cal.1963). Plaintiffs' claim was, rather, that HAS waived its privilege by failing to do more than raising a formal objection to prevent Abrams from answering the questions propounded to him on this subject during his deposition. Defendants contended that by raising an objection, HAS preserved the privilege.

■  The attorney-client privilege is that of the client, and only the client may waive the privilege. *Republic Gear Co. v. Borg-*

---

**2.**  The Senate's version provided in part:

"However, in civil actions and proceedings, arising under 28 U.S.C. § 1332 or 28 U.S.C. § 1335, or between citizens of different States and removed under 28 U.S.C. § 1441(b), the

privilege of a witness, person, government, State or political subdivision thereof is determined in accordance with State law, unless with respect to the particular claim or defense, Federal law supplies the rule of decision."

*Warner Corp.,* 381 F.2d 551, 556 (2 Cir. 1967); *Tillotson v. Boughner,* 350 F.2d 663, 665 (7 Cir. 1965). "[A]n attorney can neither invoke the privilege for his own benefit when his client desires to waive it nor waive the privilege without his client's consent to the waiver." *Republic Gear Co. v. Borg-Warner Corp., supra,* 381 F.2d at 556.

■ This is not to say, however, that an attorney may not waive the privilege on behalf of his client. The nature of the trial process is such that an attorney, and not the client, must have the immediate and ultimate responsibility of deciding if and when to raise objections. *See Wainwright v. Sykes,* 433 U.S. 72, 93, 97 S.Ct. 2497, 53 L.Ed.2d 594 (1977) (Burger, C. J., concurring opinion). A client is therefore bound by his attorney's failure to raise timely objections during the trial process. *Curry v. Wilson,* 405 F.2d 110, 112 (9 Cir. 1968), *cert. denied,* 397 U.S. 973, 90 S.Ct. 1090, 25 L.Ed.2d 268 (1970).

■ Although an attorney may waive the attorney-client privilege on behalf of his client, he does so only if he, on behalf of his client, either voluntarily discloses or voluntarily consents to disclosure of part of the privileged communication. *Cf. Handgards, Inc. v. Johnson & Johnson,* 413 F.Supp. 926, 929 (N.D.Cal.1976). Before there can be a waiver, therefore, HAS through its counsel must have voluntarily consented to Abrams' disclosure of part of the conversation he had had with Nielsen. Although counsel for HAS did formally object to the questions posed to Abrams, the Court found that by failing to take reasonable and available steps to prevent disclosure, under all of the circumstances, constituted a voluntary consent to disclosure of part of the privileged communication.

There were a number of alternatives available to HAS in order to preserve the privilege. Before Abrams' deposition was taken, HAS undoubtedly was aware of the possibility that plaintiffs would question Abrams about conversations he had had with Nielsen concerning payments to Cubbler. If HAS intended to raise the privilege with respect to such conversations, it could have sought a protective order pursuant to Rule 26(c) of the Federal Rules of Civil Procedure [3] before the deposition was taken.

■ Having failed to do this, HAS could have terminated the deposition and applied for a protective order pursuant to Rule 30(d) of the Federal Rules of Civil Procedure [4] when it became apparent that,

---

**3.** Rule 26(c) of the Federal Rules of Civil Procedure provides:

"Upon motion by a party or by the person from whom discovery is sought, and for good cause shown, the court in which the action is pending or alternatively, on matters relating to a deposition, the court in the district where the deposition is to be taken may make any order which justice requires to protect a party or person from annoyance, embarrassment, oppression, or undue burden or expense, including one or more of the following: (1) that the discovery not be had; (2) that the discovery may be had only on specified terms and conditions, including a designation of the time or place; (3) that the discovery may be had only by a method of discovery other than that selected by the party seeking discovery; (4) that certain matters not be inquired into, or that the scope of the discovery be limited to certain matters; (5) that discovery be conducted with no one present except persons designated by the court; (6) that a deposition after being sealed be opened only by order of the court; (7) that a trade secret or other confidential research, development, or commercial informa- tion not be disclosed or be disclosed only in a designated way; (8) that the parties simultaneously file specified documents or information enclosed in sealed envelopes to be opened as directed by the court.

"If the motion for a protective order is denied in whole or in part, the court may, on such terms and conditions as are just, order that any party or person provide or permit discovery. The provisions of Rule 37(a)(4) apply to the award of expenses incurred in relation to the motion."

**4.** Rule 30(d) of the Federal Rules of Civil Procedure provides:

"At any time during the taking of the deposition, on motion of a party or of the deponent and upon a showing that the examination is being conducted in bad faith or in such manner as unreasonably to annoy, embarrass, or oppress the deponent or party, the court in which the action is pending or the court in the district where the deposition is being taken may order the officer conducting the examination to cease forthwith from taking the deposition, or may limit the scope and manner of the taking of the

despite its objection, Abrams was about to reveal the information they believed to be privileged.

■ At the very least, HAS should have advised Abrams not to answer the questions. Although HAS rightly pointed out that inasmuch as Abrams was no longer an officer of HAS,[5] it had no authority to prevent him from answering, the fact remains that HAS made no effort to stop Abrams from answering other than raising an objection. The decision reached by this Court was not based upon a per se rule that HAS automatically waived its privilege by failing to move for a protective order before or during the deposition, or by failing to advise Abrams not to answer. Instead, the question was whether, based on all the circumstances surrounding Abrams' deposition, HAS voluntarily consented to Abrams' disclosure. This Court found that HAS did voluntarily consent.

Defendants' actions during Abrams' deposition were of significance in reaching this result. It appears that defendants in actuality were not opposed to Abrams answering the questions. If, as plaintiffs claim, Abrams' description of his conversation with Nielsen supports defendants' position, defendants' actions are quite understandable. Defendants may have been aware that Abrams' description would support their position, but concerned that Nielsen's version

of the conversation would not be so favorable. Under these circumstances defendants had much to gain by allowing Abrams to answer plaintiffs' questions so long as they could preserve HAS's privilege so as to keep Nielsen from having to give his version of the same conversation.

Thus, the instant case is more analogous to a situation where the holder of a privilege lets in part of a privileged communication and then seeks to keep the remainder of the communication out. See, e. g., Handgards, Inc. v. Johnson & Johnson, supra, 413 F.Supp. at 929. "[A] party may not insist on the protection of the attorney-client privilege for damaging communications while disclosing other selected communications because they are self-serving." 413 F.Supp. at 929. In light of all of the circumstances present here, by failing to do more than raise a formal objection when Abrams was questioned about conversations he had had with Nielsen regarding payments made to Cubbler, HAS voluntarily consented to the disclosure by Abrams of such conversations. Accordingly, defendants cannot now claim the privilege to prevent Nielsen from answering questions about these same conversations.

HAS's waiver of the privilege must be strictly construed, however, to "that specific subject during the particular conversation." *Goldman, Sachs & Co. v. Blondis,*

deposition as provided in Rule 26(c). If the order made terminates the examination, it shall be resumed thereafter only upon the order of the court in which the action is pending. Upon demand of the objecting party or deponent, the taking of the deposition shall be suspended for the time necessary to make a motion for an order. The provisions of Rule 37(a)(4) apply to the award of expenses incurred in relation to the motion."

Rule 30(d) is the only authority allowing the interruption of a deposition. The usual procedure to follow when an objection is raised to a question propounded in a deposition is for the attorney who raises the objection to note his objection but to allow the question to be answered. *Ralston Purina Co. v. McFarland,* 550 F.2d 967, 973–974 (4 Cir. 1977); *Banco Nat'l de Credito v. Bank of America Nat'l Trust & Sav. Ass'n,* 11 F.R.D. 497, 499 (N.D.Cal.1951).

Where the objection raised is based on a privilege, however, the usual procedure obvi-

ously is not sufficient protection. The attorney should therefore halt the deposition and apply for a protective order pursuant to Rule 30(d). *See Preyer v. United States Lines,* 64 F.R.D. 430, 431 (E.D.Pa.1973), aff'd, 546 F.2d 418 (3 Cir. 1976); *Shapiro v. Freeman,* 38 F.R.D. 308, 311 (S.D.N.Y.1965). Although Rule 30(d) strictly construed does not allow the deposition to be halted simply because allegedly privileged information is sought, a strict application of Rule 30(d) when the objection involves a privilege would frustrate the values protected by the privilege. *Shapiro v. Freeman, supra,* 38 F.R.D. 308.

5. Abrams was President of PPI at the time of his deposition, and PPI therefore did have the power to instruct Abrams not to answer. The Court did not rely upon this fact, however, since the privilege asserted here apparently is that of HAS.

412 F.Supp. 286 (N.D.Ill.1976); *cf. Handgards, Inc. v. Johnson & Johnson, supra,* 413 F.Supp. 926. The subject of the conversation disclosed by Abrams was payments made by defendants to Cubbler. HAS therefore waived its privilege only as to communications between Abrams and Nielsen concerning payments to Cubbler.

Accordingly, the order was limited to:

1. Questions concerning statements made to Nielsen by plaintiff Janine Perrignon during the period of time that both of them were employees of HAS concerning payments by BBC, HAS or PPI.

2. Questions concerning Nielsen's conversations with Abrams regarding payments by HAS or PPI through Harry Colby or any other agent or employee to Charles Cubbler.

3. Those questions more specifically set out in Appendix A, attached hereto and incorporated by reference herein, and any questions which naturally evolve from those questions within the same subject area.

## APPENDIX A

### A. *Payments to Cubbler*

1. "Q. Did you ever hear Mr. Cubbler's name at the time you were employed by Paid Prescriptions services?" (James Nielsen Deposition of May 24, 1977, p. 18, lines 25–26.)

2. "Q. If you ever heard that name, did you hear it from an employee who had a position so as to be in a position that spoke on behalf of the company?" (*Id.* at p. 20, lines 6–8.)

### B. *Ward's Drafting of Documents*

1. "Q. In your reading about the Senate Investigating Committee, do you recall ever reading that Mr. Ward was alleged to have been involved in drafting some specifications that ultimately resulted in requests for proposals that were issued by certain states to either Health Applications Systems or Paid?

"A. I have read that statement in the press, yes.

"Q. Did you ever have any knowledge that he was involved in that activity when you were working for them?" (*Id.* at p. 23, lines 11–18.)

2. "Q. In your reading, or from any other source, had you ever learned or heard that at the time that Mr. Ward, if he was involved in this activity, happened to coincide with the time at which Paid and H.A.S. was alleged to have been making payments to Mr. Cubbler?" (*Id.* at p. 23, lines 24–28.)

### C. Conversations with Janine Perrignon Concerning Cubbler

1. "Q. Do you recall a conversation that you had while you were still employed as counsel for Paid and for Health Application Systems with Janine about Charlie Cubbler?" (*Id.* at p. 30, lines 2–4.)

2. "Q. Was there a discussion with Janine Perrignon about the drawing of a voucher for the payment of $300 to Charlie Cubbler?" (*Id.* at p. 34, line 27 to p. 35, line 1.)

3. "Q. Now, do you recall if there was any such discussion where another person was present, a person by the name of Anderson?" (*Id.* at p. 35, lines 4–6.)

### D. *Availability of Documents*

1. "Q. Do you recall whether or not memoranda were composed on any matters of which you have taken the privilege this morning?" (*Id.* at p. 73, line 28 to p. 74, line 2.)

2. "Q. I have to read you something about that. Mr. Nielsen, I am reading to you from the hearings before the Permanent Subcommittee on Investigations into the MMIS matter at Page 114–115, and I am reading from a portion of the report that was prepared by an investigator from Walter Fialkuwicz. His report begins at Page 109 and I am reading from Page 115, and it reads as follows:

" 'Subcommittee staff interviewed Colby who said the payments to Cubbler were for consulting. He said the company needed to have regulations interpreted and Cubbler was quite knowledgeable about those regulations.

" 'The Bergen Brunswig attorney told the Subcommittee staff that corporate counsel became aware of the payments shortly after they were made. The attorney said that counsel directed that they be stopped. The attorney told Subcommittee staff that it was wrong to have made the payments, but that they had nothing to do with the contracts. He said the company informed the Pennsylvania Attorney General of the payments and that a memo on the matter was prepared. The Pennsylvania Attorney General's office says it received no such information.'

"Now, is that a quotation of anything that you said to an investigator of the Senate committee?

"A. No, it is not.

"Q. Then do you have any knowledge of any such memorandum having been prepared? What I just read?" (*Id.* at p. 75, line 14 to p. 76, line 10.)