John N. ROBINSON, Plaintiff,

v.

George J. MAGOVERN, Cardiothoracic, Surgical Associates, Inc., Allegheny General Hospital, and Henry G. Allyn, Jr., Gay E. Bodick, Fred Brand, Jr., Henry Chalfant, Ronald R. Davenport, Harry Edelman, III, Harry M. Epstein, William H. Genge, W. R. Krome George, R. Burt Gookin, Thomas C. Graham, Kenneth C. Hewitt, John A. Huffman, Jr., B. F. Jones, III, Bernard H. Jones, Caryl M. Kline, Richard K. Means, Francis B. Nimick, David B. Oliver, II, Robert B. Pease, G. Harton Singer, III, Elizabeth A. Smith, W. P. Snyder, III, Leonard A. Swanson, W. Bruce Thomas and Paul H. Weyrauch, Individually and as Trustees of Allegheny General Hospital, Defendants.

Civ. A. No. 77–75.

United States District Court,
W. D. Pennsylvania.

May 22, 1979.

On Motion to Compel July 18, 1979.

Roslyn L. Litman and John E. Grasberger, Litman, Litman, Harris & Spector, Pittsburgh, Pa., for plaintiff; H. Yale Gutnick, McKenna & Strassburger, Pittsburgh, Pa., on motion.

Robert Frantz, Buchanan, Ingersoll, Rodewald, Kyle & Buerger, Pittsburgh, Pa., for defendants Magovern and Cardiothoracic Associates.

David L. McClenahan, Kirkpatrick, Lockhart, Johnson & Hutchinson, Pittsburgh, Pa., for all other defendants.

John P. McComb, Jr., Moorhead & Knox, Pittsburgh, Pa., on motion for Shadyside Hospital.

## OPINION

SNYDER, District Judge.

In this antitrust action for denial of hospital staff privileges, Plaintiff moves this Court for an order compelling Defendants and certain third party witnesses to respond to discovery requests and deposition questions. The defendants have objected, claiming the information sought is subject to a testimonial privilege. The Defendants' objections are overruled, and the Motion to Compel shall be granted.

An extensive account of the allegations is contained in our previous opinion on Defendants' Motions for Summary Judgment. *Robinson v. Magovern*, 456 F.Supp. 1000 (W.D.Pa.1978). We repeat only the facts necessary for an understanding of the issue now before us. Dr. John N. Robinson brought suit for denial of staff privileges against Dr. George J. Magovern, Director of the Department of Surgery and Chief of Thoracic Surgery at Allegheny General Hospital; Cardiothoracic Surgical Associates, Inc. (CTSA), a professional corporation of physicians specializing in cardiothoracic surgery; and Allegheny General Hospital (AGH) and its Trustees, individually and as Trustees, alleging violation of the Sherman Act and pendent state claims of breach of

contract, tortious interference with contract, and restraint of trade.[1]

Robinson contends there was an agreement between Dr. Magovern, CTSA, AGH and its Trustees to preclude the Plaintiff and all cardiothoracic surgeons not associated with CTSA from obtaining staff privileges. It is alleged that Magovern, as the senior partner in CTSA, and CTSA had a financial interest in persuading AGH to deny staff privileges to any thoracic surgeon not associated with CTSA.

According to the information contained in the pleadings and testimony adduced at the depositions taken thus far, Robinson met with Magovern early in 1976 to discuss the possibility of Robinson's obtaining staff privileges as a cardiothoracic surgeon at AGH. Nothing came of this meeting, and on September 30, 1975, Robinson filed a written application for staff privileges. In accordance with the normal processing of such applications, the Hospital administration requested letters of recommendation from the physicians at the hospitals where Robinson had practiced, and informed Magovern of the application. Magovern was not a member of the Credentials Committee of AGH, but apparently was given the responsibility of checking into the qualifications of Robinson, since Magovern was director of the department to which Robinson applied (Surgery), as well as chief of the division within the department to which Robinson applied (Thoracic Surgery). Magovern spoke with several physicians who knew Robinson, including some of his former associates.

Magovern forwarded two memoranda to the Credentials Committee recommending staff privileges not be granted to Robinson: one was the formal "Report on Application By Departmental Director," which Magovern submitted as Director of Surgery; the other was an informal letter Magovern wrote, allegedly as Chief of the Thoracic Surgery Division. After considering the reference letters and Magovern's recommendations (the record is not clear on what else was considered by the Credentials Committee), the Credentials Committee recommended denial of staff privileges. The application was then considered and rejected by the Executive Committee of the Medical Staff, which has final authority on the granting or denial of staff privileges. Exactly what occurred at the meetings of the Credentials Committee and the Executive Committee, and why Robinson's application was denied is the thrust of Plaintiff's discovery requests.

Harold D. Sanders, Executive Vice President of AGH, is responsible for handling the administrative aspects of an application for staff privileges and is a member of the Executive Committee. Sanders was not present at the meeting during which Robinson's qualifications were discussed, but he was given a summary of the proceeding by Lad F. Grapski, President of AGH. Sanders has refused to say what was discussed at the meeting. He also refused to discuss why staff privileges in cardiothoracic surgery were denied to Dr. Alavi, this occurring about the same time as the denial to Robinson.

Magovern was a member of the Executive Committee at the time Robinson's application was considered; however, Magovern did not attend all committee meetings, and at this point does not recall attending a meeting at which Robinson's application was reviewed. As previously mentioned, Magovern, in his capacity as Director of the Department of Surgery, talked with several doctors about Robinson. The conversations with these doctors occurred sometime between Robinson's filing of a written application and the denial of privileges by the Executive Committee. The discussions we are considering now occurred in rather informal settings, i. e., they did not occur during a formal meeting of one of the committees. Magovern talked with Dr. Cooley about Robinson during a meeting of thoracic surgeons in Washington, D. C. Magovern had a telephone conversation with Dr. Edward E. Longabaugh and a telephone

---

1. In our previous opinion, we granted the Defendants summary judgment on the Plaintiff's constitutional, civil rights and federal contractual claims.

conversation and a meeting with Dr. Giacobine in Giacobine's office; these events occurred in Pennsylvania. As far as the record reveals now, Cooley, Longabaugh, and Giacobine knew that Magovern was investigating Robinson's qualifications in regard to Robinson's application at AGH. Magovern thus far has refused to state what he asked these doctors and what their responses were.

Plaintiff's first set of interrogatories to Defendant Magovern, No. 20, asked Magovern to "[i]dentify all persons with whom you spoke concerning Dr. John Robinson and/or his attempts to gain admission to the Medical Staff of AGH. With respect to each such person with whom you spoke, state the date, the location and the substance of each such conversation."

Plaintiff's first request for production, No. 15, addressed to all Defendants was for "[a]ll documents in the nature of correspondence or minutes or notes of meetings or conversations relating in anyway to: (a) the professional qualifications of Dr. John N. Robinson; (b) the professional conduct of Dr. John N. Robinson; (c) the extra-professional conduct of Dr. John N. Robinson; (d) the attempts by Dr. John N. Robinson to gain admission to the staff of any hospital, including without limitation, Allegheny General Hospital; and (e) this lawsuit."

Plaintiff's second request for production, No. 16, addressed to all Defendants was for "[a]ll correspondence, including form letters, sent or received by AGH or George Magovern concerning Plaintiff's application for AGH staff privileges"; No. 19 was for "[a]ll documents, including but not limited to documents reflecting the comments of Dr. Magovern, concerning Dr. Alavi, his request for staff privileges, and the denial thereof"; and No. 21 was for "[a]ll documents comprising or concerning the report of the Executive Committee of the Medical Staff following the hearing on June 21, 1976."

Objections were raised to these requests. Since that time, however, Magovern has identified with whom he talked concerning Robinson's application. Furthermore, during the deposition of Harold Sanders, certain documents were produced, namely, the report of Magovern to the Credentials Committee and the letters of recommendation on Robinson which had been sent to AGH. Otherwise, the Defendants persist in their objections to further discovery along these lines.[2]

The Defendants originally interposed objections to discovery claiming that the conversations and documents were within the confidentiality provisions of Pennsylvania's Peer Review Protection Act, 63 P.S. § 425.1. Peer Review is defined in the Act as

"the procedure for evaluation by professional health care providers of the quality and efficiency of services ordered or performed by other professional health care providers, including practice analysis, inpatient hospital and extended care facility utilization review, medical audit, ambulatory care review, claims review, and the compliance of a hospital, nursing home or convalescent home or other health care facility operated by a professional health care provider with the standards set by an association of health care providers and with applicable laws, rules and regulations."

63 P.S. § 425.2. A review organization is defined as "any committee engaging in peer review, including . . . any hospital board, committee or individual reviewing the professional qualifications or activities of its medical staff or applicants for admission thereto." *Id.* The Act also provides that a review organization's proceedings and records will be kept in confidence:

"*Confidentiality of review organization's records*

---

**2.** During the deposition of Dr. Giacobine, a non-party witness, Giacobine, on the advice of counsel, refused to answer questions about conversations with Magovern or anyone concerning Robinson, or concerning the investigation of an incident between Robinson and Dr. DeCappa at St. Francis Hospital. Giacobine has since made it clear to the Court that he is prepared to testify with respect to his knowledge of any conversations that may be within the protection of the Peer Review Act; he is not asserting any privilege he may have as one who provided information to a review organization.

The proceedings and records of a review committee shall be held in confidence and shall not be subject to discovery or introduction into evidence in any civil action against a professional health care provider arising out of the matters which are the subject of evaluation and review by such committee and no person who was in attendance at a meeting of such committee shall be permitted or required to testify in any such civil action as to any evidence or other matters produced or presented during the proceedings of such committee or as to any findings, recommendations, evaluations, opinions or other actions of such committee or any members thereof: Provided, however, That information, documents or records otherwise available from original sources are not to be construed as immune from discovery or use in any such civil action merely because they were presented during proceedings of such committee, nor should any person who testifies before such committee or who is a member of such committee be prevented from testifying as to matters within his knowledge, but the said witness cannot be asked about his testimony before such a committee or opinions formed by him as a result of said committee hearings."

63 P.S. § 425.4 (See Act 262, 1978 Pa.Legis. Serv. 887).

The Hospital and the Trustees have stated that it is in their best interests that all matters bearing on the investigation into Plaintiff's qualifications and the reasons for the subsequent decision to refuse Plaintiff staff privileges be made part of the record. However, in the interest of fostering effective peer review, they object to the discovery. Similarly, Magovern and CTSA persist in their position that peer review communications should be privileged, although now, all argue that this should be so as a matter of federal law based on the reasonable expectations created by the Pennsylvania law.

■ Rule 26(b)(1) of the Federal Rules of Civil Procedure provides for broad discovery: "Parties may obtain discovery regarding any matter, *not privileged,* which is relevant to the subject matter involved in the pending action . . . ." (Emphasis supplied). Although the Rules of Civil Procedure do not define "privileged", the term is generally understood to refer to those evidentiary privileges applicable at trial. *See United States v. Reynolds,* 345 U.S. 1, 73 S.Ct. 528, 97 L.Ed. 727 (1953); *Boyd v. Gullett,* 64 F.R.D. 169 (D.Md.1974). Rule 501 of the Federal Rules of Evidence provides:

"Except as otherwise required by the Constitution of the United States or provided by Act of Congress or in rules prescribed by the Supreme Court pursuant to statutory authority, the privilege of a witness, person, government, State, or political subdivision thereof shall be governed by the principles of the common law as they may be interpreted by the courts of the United States in the light of reason and experience. However, in civil actions and proceedings, with respect to an element of a claim or defense as to which State law supplies the rule of decision, the privilege of a witness, person, government, State, or political subdivision thereof shall be determined in accordance with State law."

■ This is not a diversity case brought pursuant to 28 U.S.C. § 1332 in which state law would provide the rule of decision. Plaintiff has a federal cause of action based on alleged violations of 15 U.S.C. §§ 1 and 2, and this action is governed by federal law. *Lewis v. Radcliff Materials, Inc.,* 74 F.R.D. 102 (E.D.La.1977). Robinson has also joined pendent state claims with the federal statutory claim, and the information sought is apparently relevant to both the federal and state claims. In *Perrignon v. Bergen Brunswig Corp.,* 77 F.R.D. 455 (N.D.Cal.1978), the court recognized that it would be meaningless to hold the communication privileged for one set of claims and not the other, and even though pendent state claims were present, the federal common law of privilege was held to govern all claims of privilege, applying the

policy of Rule 501 that " '[i]n non-diversity jurisdiction civil cases, federal privilege law will generally apply.' " 77 F.R.D. at 459.

We therefore look to federal common law to determine if the Defendants here have properly invoked a privilege, observing the party objecting to discovery on the basis of privilege has the burden of establishing the existence of privilege. *United States v. Landof*, 591 F.2d 36 (9th Cir. 1978); *Reeg v. Fetzer*, 78 F.R.D. 34 (W.D.Okl.1976). The Defendants do not contend that some sort of peer review privilege existed at common law, but allege that Rule 501 is a Congressional authorization for the courts to develop and apply rules of privilege "in light of reason and experience." *In re Grand Jury Impaneled January 21, 1975*, 541 F.2d 373 (3d Cir. 1976); *United States v. King*, 73 F.R.D. 103 (E.D.N.Y.1976); 2 *J. Weinstein & M. Berger, Weinstein's Evidence* ¶ 501[02] at 501–20.5.[3]

■■ Evidentiary privileges operate to exclude relevant information from the fact finder and thus are not favored. The Supreme Court has stated: "Whatever their origins, these exceptions to the demand for every man's evidence are not lightly created nor expansively construed for they are in derogation of the search for truth." *United States v. Nixon*, 418 U.S. 683, 710, 94 S.Ct. 3090, 3108, 41 L.Ed.2d 1039, 1065 (1974). The law will sustain a claim of privilege only when necessary to protect and preserve the interest of significant public importance that the specific privilege is designed to serve. *United States v. Mandel*, 415 F.Supp. 1025 (D.Md.1976).

There are few decisions recognizing a federal common law privilege against the discovery of confidential information from hospital staff meetings reviewing the care and treatment of patients. In *Bredice v. Doctors Hospital, Inc.*, 50 F.R.D. 249 (D.D.C. 1970), *aff'd* 156 U.S.App.D.C. 199, 479 F.2d 920 (1973), the plaintiff in a malpractice action sought discovery of the minutes and reports of the hospital staff review committee and the court held the minutes and reports were entitled to a qualified privilege, stating:

"Confidentiality is essential to effective functioning of these staff meetings; and these meetings are essential to the continued improvement in the care and treatment of patients. Candid and conscientious evaluation of clinical practices is a *sine qua non* of adequate hospital care. To subject these discussions and deliberations to the discovery process, without a showing of exceptional necessity, would result in terminating such deliberations. Constructive professional criticism cannot occur in an atmosphere of apprehension that one doctor's suggestion will be used as a denunciation of a colleague's conduct in a malpractice suit.

The purpose of these staff meetings is the improvement, through self-analysis, of the efficiency of medical procedures and techniques. They are not a part of current patient care but are in the nature of a retrospective review of the effectiveness of certain medical procedures. The value of these discussions and reviews in the education of the doctors who participate, and the medical students who sit in, is undeniable. This value would be destroyed if the meetings and the names of those participating were to be opened to the discovery process."

50 F.R.D. at 250.[4]

In *Gillman v. United States*, 53 F.R.D. 316 (S.D.N.Y.1971), the plaintiff brought an

---

3. Congressman Hungate, the principal draftsman of the rules, stated: "Rule 501 is not intended to freeze the law of privilege as it now exists. The phrase 'governed by the principles of the common law as they may be interpreted by the courts of the United States in light of reason and experience,' is intended to provide the courts with the flexibility to develop rules of privilege on a case by case basis." 120 Cong.Rec. H 12,253–54 (daily ed. Dec. 18, 1974).

4. Although this decision was handed down before the 1970 amendments to the Federal Rules of Civil Procedure, when a good cause showing was required for the production of minutes and reports, the decision did not turn on that. *See Bredice v. Doctors Hospital, Inc.*, 51 F.R.D. 187 (D.D.C.1970), *aff'd*, 156 U.S.App.D.C. 199, 479 F.2d 920 (1973).

action under the Federal Tort Claims Act for the alleged negligence of government hospital employees in the suicide death of a mental patient, the plaintiff's decedent. The court refused to permit discovery of the reports of the Board of Inquiry and of the Director. However, the statements of hospital personnel made to the Board were held not to be privileged. The court considered the statements crucial to adequate discovery and believed that the threat of disciplinary action by the Board of Inquiry had, by itself, a chilling effect on testimony, not appreciably increased by the possibility of giving testimony in the courtroom in a damage action.

The rationale of *Bredice* was extended beyond the hospital setting in *Banks v. Lockheed-Georgia Co.*, 53 F.R.D. 283 (N.D. Ga.1971), a discrimination case, where the court refused to allow plaintiffs to obtain copies of a report containing candid self-analysis and evaluation of the employer's equal employment actions, prepared by the defendant employer's research team. The plaintiff did, however, receive all factual and statistical information compiled by the research team.

Similarly, access was given to the facts and statements considered by a self-evaluation board in *Wright v. Patrolmen's Benevolent Association*, 72 F.R.D. 161 (S.D.N.Y. 1976), and in *Lloyd v. Cessna Aircraft Co.*, 74 F.R.D. 518 (E.D.Tenn.1977), where the "privilege" for self-evaluation reports was held not to prevent discovery of the information gathered by the committees.[5] Finally, in *Davidson v. Light*, 79 F.R.D. 137 (D.Colo.1978), a medical malpractice case, the court held discoverable an "infection control report" which contained both factual data relating to the plaintiff patient's infection and the opinions and evaluations by the review committee of the care received by the patient from the staff. *Bredice v. Doctors Hospital, Inc., supra*, was distinguished because the infection control committee was established to deal with specific cases of infection and did not formulate or review hospital policies generally.

Our research has disclosed only three state cases, all holding that the reports of the proceedings of the committees and the internal hospital records are discoverable. *See Davison v. St. Paul Fire and Marine Insurance Co.*, 75 Wis.2d 190, 248 N.W.2d 433 (1977); *Nazareth Literary & Benevolent Institution v. Stephenson*, 503 S.W.2d 177 (Ky.1973); *Kenney v. Superior Court of Yolo County*, 255 Cal.App.2d 106, 63 Cal. Rptr. 84 (1967). *See also Annot.*, 81 A.L. R.3d 944. In *Nazareth Literary & Benevolent Institution v. Stephenson, supra*, the court was aware of the policy argument favoring confidentiality but did not find this persuasive enough to impede the discovery, and rejected *Bredice.*

There is further cause to question the vitality of *Bredice* in light of the decision in *United States v. Nixon, supra*, requiring the President to produce tape recordings and documents relating to his conversations with aides and advisors for use at a pending criminal trial. One ground argued by the President was the need for protection of communications between high government officials and those who advise and assist them. The Supreme Court acknowledged that "those who expect public dissemination of their remarks may well temper candor with a concern for appearances and for their own interests to the detriment of the decisionmaking process." Nevertheless, the Court held that this "powerful interest in confidentiality" must yield to a demonstrated specific need for evidence. Recently in *Herbert v. Lando*, 441 U.S. 153, 99 S.Ct. 1635, 60 L.Ed.2d 115 (1979), the Supreme Court reaffirmed *United States v. Nixon, supra*, on the principle that "[e]videntiary privileges in litigation are not favored and even those rooted in the Constitution must give way in proper circumstances." 441 U.S. at 175, 99 S.Ct. at 1648. In *Herbert*, inquiry was requested and ordered into the editorial processes of those alleged to be responsible for a defamatory publication, despite the defendant's argument that

**5.** In *Lloyd v. Cessna Aircraft Co.*, 74 F.R.D. 518, 522 (E.D.Tenn.1977), the court questioned

whether a self-evaluation report privilege really existed.

"frank discussion among reporters and editors will be dampened and sound editorial judgment endangered if such exchanges, oral or written, are subjected to inquiry by defamation plaintiffs."

The issue before us here presents an added twist not before the Supreme Court. Pennsylvania, the state in which the Credentials Committee and the Executive Staff conducted their evaluations of Dr. Robinson and where Magovern had most of his interviews on Robinson's qualifications (the discussion with Dr. Cooley would be an exception), recognizes and affords protection to peer review communications.

The Pennsylvania Peer Review Protection Act, titled "An Act providing for the increased use of peer review groups by giving protection to individuals and data who report to any review group", Act No. 193, July 20, 1974, P.L. 564, seeks to foster the greatest candor and frank discussion at medical review committee meetings. *Schwartz v. Tri-County Hospital*, 74 Pa.D. & C.2d 52 (C.P.Phila.1975). It is apparent from the statutory definition of review organization, 63 P.S. § 425.2, that through the grants of immunity and confidentiality the state hopes to encourage peer evaluation of the health care provided so as to: (1) improve the quality of the care rendered; (2) reduce morbidity and mortality; and (3) keep within reasonable bounds the cost of health care. We found only two reported cases dealing with the Pennsylvania Peer Review Protection Act, both of which blocked discovery of the records and minutes of review boards in accordance with the Act. *See Holliday v. Klimoski*, 75 Pa.D. & C.2d 408 (C.P.Wash.1976); *Schwartz v. Tri-County Hospital, supra.*[6]

Undoubtedly, we may look to the privileges created by state courts and applicable state statutes if the court finds them appropriate. *See United States v. Allery*, 526 F.2d 1362 (8th Cir. 1975).

In *Lora v. Board of Education of City of New York*, 74 F.R.D. 565 (E.D.N.Y.1977), a federal question case in which the defendants raised the state psychiatrist-patient privilege as an objection to plaintiff's discovery, the court stated:

"While it is true that 'in any given instance the special federal interest in seeking the truth in a federal question case may require disclosure despite the existence of a state rule holding the same communications privileged,' *Carr v. Monroe Manufacturing Co.*, 431 F.2d 384, 388 (5th Cir. 1970), *cert. den. sub nom., Aldrige v. Carr*, 400 U.S. 1000, 91 S.Ct. 456, 27 L.Ed.2d 451 (1971), we acknowledge that 'a strong policy of comity between state and federal sovereignties impels federal courts to recognize state privileges where this can be accomplished at no substantial cost to federal substantive and procedural policy.' *United States v. King*, 73 F.R.D. 103, 105 (E.D.N.Y.1976); *cf. Apicella v. McNeil Laboratories, Inc.*, 66 F.R.D. 78 (E.D.N.Y.1975). If the state holds out the expectation of protection to its citizens, they should not be disappointed by a mechanical and unnecessary application of the federal rule."

74 F.R.D. at 576.

The same question was presented in *United States v. King*, 73 F.R.D. 103 (E.D.N.Y. 1976), where the court articulated a balancing test as the proper approach:

---

**6.** The Congress has also recognized the important and useful function performed by medical peer review groups in the Professional Standards Review Organization (PSRO) legislation, 42 U.S.C. §§ 1320c to 1320c–22. Under this program which is intended "to promote the effective, efficient, and economical delivery of health care services of proper quality," practitioners who provide health care to patients under federally-funded medical programs can be reimbursed only when the local PSRO certifies that the services rendered were medically

necessary, in accord with professional standards and incapable of being rendered at a lower cost through use of alternative types of treatment. 42 U.S.C. § 1320c–4. To insure effective operation of PSROs, the federal law provides that information acquired by PRSOs generally must be held in confidence, 42 U.S.C. § 1320c–15, and that persons who provide information to a PRSO generally are immune from liability, 42 U.S.C. § 1320c–16. The federal statute has no application here.

"But whether the dictates of 'reason and experience' require judicial adoption of the substance of a state privilege cannot be determined solely by reference to the value of the implicated local interest. Rather, the justifiable 'principles of the common law' as they relate to matters of developing new privileges—those not firmly embedded in federal law—require the balancing of four factors: first, the federal government's need for the information being sought in enforcing its substantive and procedural policies; second, the importance of the relationship or policy sought to be furthered by the state rule of privilege and the probability that the privilege will advance that relationship or policy; third, in the particular case, the special need for the information sought to be protected; and fourth, in the particular case, the adverse impact on the local policy that would result from nonrecognition of the privilege. *Cf.* 8 Wigmore, Evidence § 2286 at 527 (McNaughton rev. 1961)."

73 F.R.D. at 105.

After an exhaustive consideration of the state privilege and the factual context in which it was being asserted, the court in *Lora v. Board of Education of City of New York, supra,* determined disclosure would have little impact on the policy behind the state privilege. This slight impact, when weighed against the strong need for all relevant evidence in litigation generally, and particularly in a case involving significant issues affecting the public interest (a civil rights action), led the court to order production of the requested documents. Similarly, in *United States v. King, supra,* the court recognized the need for full revelation of pertinent evidence to be the most powerful and least variable of the four factors, while the policy behind the local privilege was found to be weak and only marginally served by the policy. Thus disclosure was compelled. *See also Ryan v. Commissioner of Internal Revenue,* 568 F.2d 531 (7th Cir. 1977), *cert. den.* 439 U.S. 820, 99 S.Ct. 84, 58 L.Ed.2d 111 (1978) (court employed balancing test and refused to extend the marital privilege against adverse spousal testimony because unlikely to further underlying rationale).

The Third Circuit faced a similar problem in *In re Grand Jury Impaneled January 21, 1975, supra.* There a prothonotary sought to quash a subpoena issued by a federal grand jury directing him to produce retainer agreements filed with him by a law firm. The filing was required by a local rule of the court of common pleas which also provided that the filed agreements were "subject to inspection only by order of the Court, by the client or by the Disciplinary Board of the Supreme Court of Pennsylvania." There was a valid state interest in granting confidentiality to these reports: ensuring voluntary compliance with the filing requirements. The court held that any incidental and speculative effect enforcement of the subpoena would have on voluntary compliance with the filing requirements was outweighed by the grand jury's need for the evidence. Thus, where important federal interests are concerned, the court should examine the state's policy of confidentiality. *See In re Grand Jury Proceedings,* 563 F.2d 577, 585 n.4 (3rd Cir. 1977).

We find very instructive the Fifth Circuit's decision in *Feminist Women's Health Center, Inc. v. Mohammad,* 586 F.2d 530 (5th Cir. 1978). There, an abortion clinic brought action against the state Board of Medical Examiners alleging that the doctors conspired to boycott the clinic and to fix prices for abortions in the area. In the course of its opinion reversing summary judgment rendered in favor of the defendants, the court noted that despite a state law barring the use of committee records and proceedings as evidence in civil actions, the state law would not operate to bar the use of such evidence in the trial of this federal cause of action. 586 F.2d at 544 n.9.

The present case presents a very close question. On the one hand, peer review protection furthers an important state interest: improving health care. Specifically, we think the grant of confidentiality over the proceedings of hospital committees re-

viewing applications for staff privileges facilitates frank discussion of the applicant's qualifications. On the other hand, the subject matter of the discovery goes to the heart of the issues in this case, *i. e.* why Robinson was denied staff privileges. AGH and its Trustees concede the relevancy of this information in their brief: "In light of Plaintiff's conspiracy claims it is in the interest of our clients in this litigation that all matters bearing on the investigation into Plaintiff's qualifications and the reasons for the subsequent decision to refuse Plaintiff staff privileges be made part of the record." As a final matter, the Court is aware that within the framework of peer review groups, there exists the potential for doctors to use them for anti-competitive purposes. *See Feminist Women's Health Center, Inc. v. Mohammad, supra; Note, Physician Influence: Applying Noerr-Pennington to the Medical Profession*, 1978 Duke L.J. 701, 720.

On the balance, although there is a "powerful interest in confidentiality", the need for this relevant evidence requires disclosure. The Court notes that besides the confidentiality provisions, the Pennsylvania statute grants immunity to participants of the peer review procedure. 63 P.S. § 425.3 provides:

> *"Immunity from liability*
>
> (a) Notwithstanding any other provision of law, no person providing information to any review organization shall be held, by reason of having provided such information, to have violated any criminal law, or to be civilly liable under any law, unless:
>
> (1) such information is unrelated to the performance of the duties and functions of such review organization, or
>
> (2) such information is false and the person providing such information knew, or had reason to believe, that such information was false.
>
> (b)(1) No individual who, as a member or employee of any review organization or who furnishes professional counsel or services to such organization, shall be held by reason of the performance by him

of any duty, function, or activity authorized or required of review organizations, to have violated any criminal law, or to be civilly liable under any law, provided he has exercised due care.

> (2) The provisions of paragraph (1) of this subsection shall not apply with respect to any action taken by any individual if such individual, in taking such action, was motivated by malice toward any person affected by such action."

Our opinion does not affect the immunity granted by the statute.

## ON MOTION TO COMPEL

In this antitrust action for denial of hospital staff privileges, Plaintiff moves this Court for an order compelling Shadyside Hospital (Shadyside), not a party to this action, to respond to requests for production of documents. Shadyside has objected, claiming that the information sought is subject to privilege. Shadyside's objections are without merit, and the Motion to Compel shall be granted.

Dr. John N. Robinson brought suit for denial of staff privileges against the Defendants, alleging they conspired to refuse him staff privileges and thus eliminate him as a competitor in the field of open heart surgery, and that in so doing they have monopolized a relevant product and geographic market. Dr. Robinson must, as part of his burden, establish the relevant product and geographic market. *See Robinson v. Magovern*, 456 F.Supp. 1000, 1006 (W.D.Pa.1978). To do this, he subpoenaed five non-party hospitals in the relevant area where open heart surgery is performed. The subpoena requested, *inter alia*, documents indicating the total number of open heart operations performed at the hospital in 1976, and for each such operation: (a) the address of the patient (zip code only); (b) the procedure performed; (c) the operating physician; (d) the assisting physician; and (e) the referring physician.

Shadyside states that compliance with this request would require disclosure of certain confidential patient information. While admitting that the requested infor-

90

mation is "highly generalized", Shadyside contends that the revelation thereof may, together with other information available to the inquirer, lead to disclosure of the condition and treatment received by patients of Shadyside Hospital. Thus Shadyside, on behalf of its affected patients, claims that the subpoena is an invasion of the privacy of the patients involved and, additionally, that the information sought is privileged under Pennsylvania law as coming within the physician-patient relationship.

Rule 26(b)(1) of the Federal Rules of Civil Procedure provides for broad discovery: "Parties may obtain discovery regarding any matter, *not privileged*, which is relevant to the subject matter involved in the pending action . . . ." (Emphasis supplied).

■■■ We will deal first with Shadyside's claim of evidentiary privilege. In the previous portion of this opinion we held that, pursuant to F.R.Evid. 501, we will look to federal common law to determine whether a privilege exists, although we will give consideration to the state privilege law. There is no common law physician-patient privilege, and none has been accorded in the federal courts as a general evidentiary principle. *In re Grand Jury Subpoena*, 460 F.Supp. 150 (W.D.Mo.1978); *Mariner v. Great Lakes Dredge & Dock Co.*, 202 F.Supp. 430 (N.D.Ohio 1962). *See also United States v. Meagher*, 531 F.2d 752 (5th Cir. 1976). Furthermore, even if the Pennsylvania doctor-patient privilege statute, 28 P.S. § 328,[1] were applicable, it would not avail Shadyside. In *Woods v. National Life and Accident Insurance Co.*, 347 F.2d 760 (3rd Cir. 1965), the court held that the stat-

ute did not prevent the doctor from disclosing

"the purpose of his examination, his diagnosis and treatment. The Act applies only to communications made by a patient to a physician in a civil action: *Phillips's Estate*, 295 Pa. 349, 145 A. 437 (1929), and then only if they tend to blacken the character of the patient. *Soltaniuk v. Metropolitan Life Ins. Co.*, 133 Pa.Super. 139, 143–144, 2 A.2d 501 (1938). With the exception of the name, address and so forth, and a few items concerning the patient's health history entered in his records, Dr. Greenlee's testimony did not and would not have revealed any information obtained by communications from the patient. The revealing of a name, address and other identifying data given by a patient is not a communication which tends to blacken the character of the patient. *Sweeney v. Green*, 116 Pa.Super. 190, 176 A. 849 (1935)."

*See also, In re B*, 482 Pa. 471, 394 A.2d 419 (1978) (privilege protects only "communications," disclosure of which would "tend to blacken" the patient's reputation). Thus, there is no evidentiary privilege to bar disclosure of the information sought here.

■■■ As to the constitutional right of privacy, Shadyside urges us to adopt the holding of a recent Pennsylvania Supreme Court case, *In re B, supra*.[2] *In re B* focused on the psychotherapist-patient relationship. The Pennsylvania Supreme Court recognized that "[t]he nature of the psychotherapeutic process is such that disclosure to the therapist of the patient's most intimate emotions, fears, and fantasies is required.

---

1. 28 P.S. § 328 provides:

"No person authorized to practice physics or surgery shall be allowed, in any civil case, to disclose any information which he acquired in attending the patient in a professional capacity, and which was necessary to enable him to act in that capacity, which shall tend to blacken the character of the patient, without consent of said patient, except in civil cases, brought by such patient, for damages on account of personal injuries."

2. *In re B* is the pronouncement of the Pennsylvania Supreme Court on the constitutional right of privacy based on the U.S. Constitution and the Pennsylvania Constitution. The decision is not binding on this Court. Nevertheless, as we interpret the opinion, it is in accord with federal law. *See, e. g., Whalen v. Roe*, 429 U.S. 589, 97 S.Ct. 869, 51 L.Ed.2d 64 (1977); *Caesar v. Mountanos*, 542 F.2d 1064 (9th Cir. 1976); *Lora v. Board of Education of City of New York*, 74 F.R.D. 565 (E.D.N.Y. 1977).

* * * In laying bare one's entire self, however, the patient rightfully expects that such revelations will remain a matter of confidentiality exclusively between patient and therapist." 394 A.2d at 425–26. Thus, the court concluded "an individual's interest in preventing the disclosure of information revealed in the context of a psychotherapist-patient relationship has deeper roots than the Pennsylvania doctor-patient privilege statute, and that the patient's right to prevent disclosure of such information is constitutionally based." 394 A.2d at 425.

The opinion in *In re B* does not indicate whether it is to be applied to doctor-patient relationships generally or is limited to psychotherapist-patient relationships. The court dwelled on the unique, highly personal nature of the disclosures in a psychotherapist-patient relationship, suggesting a very limited scope to the decision. The distinction between doctor-patient relationships generally and psychotherapist-patient relationships is well grounded in precedent. The most obvious example is in the Federal Rules of Evidence. Proposed Rule 504 provided for a psychotherapist-patient privilege and rejected a general doctor-patient privilege. *See* 56 F.R.D. 183, 240–41. (This rule and all of the specific privilege rules were rejected by Congress in favor of the more general Rule 501.)

 Nevertheless, assuming there is some constitutional right of privacy protecting the more general doctor-patient relationship, we do not think there is sufficient invasion of the right here with the release of limited information under an order of confidentiality. Claims of privacy rooted in the Constitution are not absolute, but are qualified and are to be balanced against weighty competing private and state interests. *See Caesar v. Mountanos*, 542 F.2d 1064 (9th Cir. 1976); *Lora v. Board of Education of City of New York*, 74 F.R.D. 565, 572 (E.D.N.Y.1977) (*citing Branzburg v. Hayes*, 408 U.S. 665, 92 S.Ct. 2646, 33 L.Ed.2d 626 (1972) (Powell, J., concurring)).

In *Lora v. Board of Education of City of New York, supra*, Judge Weinstein was faced with a motion to compel production of diagnostic and referral files (which included the results of psychological and psychiatric consultations or examinations) of some New York City school children who were not parties to the action. In ruling that the plaintiffs were entitled to see selected psychiatric, psychological, social work and related records of anonymous children, Judge Weinstein conducted an exhaustive analysis of what are the reasonable interests of persons claiming privacy. He noted that "[m]ost persons protest not the mere disclosure of private embarrassing or damaging information, but rather the concomitant disclosure of identifying data." 74 F.R.D. at 580. He reviewed several cases, including *Department of the Air Force v. Rose*, 425 U.S. 352, 96 S.Ct. 1592, 48 L.Ed.2d 11 (1976), a suit under the Freedom of Information Act, wherein the Supreme Court held that disclosure of material contained in personnel and medical files that would otherwise "constitute a clearly unwarranted invasion of privacy," would be permissible where the names and identifying characteristics of the subjects were deleted. 74 F.R.D. at 581.

Judge Weinstein recognized that

"[a]nonymity, while undoubtedly reducing the decree of invasion of privacy attendant upon dissemination, does not necessarily, then, reduce that invasion to zero. Discovery of the redacted files might, therefore, conceivably impinge upon the child's right to privacy, although that child remains unidentifiable. Given, however, the broad powers and duty of this court to fashion 'protective orders that will give appropriate regard to the privacy and dignity of the individuals affected,' this impact can be kept to a minimum." (Citation omitted)

74 F.R.D. at 582.

This approach is adequately supported by the Supreme Court's decision in *Whalen v. Roe, supra*. There, suit was brought challenging the constitutionality of New York Public Health Law provisions requiring all prescription "Schedule II" drugs to be prepared on official forms, identifying the patient's name, address and age, and a copy of

which was to be sent to a state bureau and retained for five years. The Court recognized the plaintiffs had valid privacy interests at stake, but did not find a sufficient invasion of any right or liberty protected by the Fourteenth Amendment. "Such disclosures . . . [are not] meaningfully distinguishable from a host of other unpleasant invasions of privacy that are associated with many facets of health care." The Court relied on the fact that access to the information was rigidly safeguarded, and that while the stored data might be offered in evidence in a legal proceeding, judicial supervision of its use would constitute adequate protection from a constitutional perspective. Commenting on *Whalen v. Roe, supra,* Judge Weinstein concluded in *Lora v. Board of Education of City of New York, supra*:

> "If such safeguards and other considerations render the attendant invasion of privacy permissible where identifiable data is involved, and where there was positive evidence of deterrence, then in this case where anonymity is assured and no proof of adverse impact has been adduced, limited disclosure is even more clearly permissible."

74 F.R.D. at 573–74.

In the present case, the anonymity of the patients concerned is preserved, and the requested information will be released under a confidentiality order. The intrusion into the right of privacy is minimal, and the need for the information is great. An appropriate order granting the Motion to Compel will be entered.